MARGARET LEWIS, *et al.*, Appellees, v. JAMES M. ARBUCKLE, *et al.*, Appellants.

THE SAME v. FRANK MILLER, *et al.*, Appellants.

1. Conveyance: UNDUE INFLUENCE: EVIDENCE. In an action to set aside a conveyance of lands as having been obtained through undue influence and false promises, it appeared that the grantor, a widow eighty years of age, died within sixty days after the conveyance, and that her husband died about a year prior to that time. The plaintiffs were children of the grantor, and one of them, a daughter, living in a neighboring county, had visited her mother after her father's death, and afterwards wrote her two letters. Another daughter, living in the same state for twelve years, had not seen, nor visited, her mother, nor had any communication with her during that time. Another daughter, likewise living in the same state, had not visited her parents for four years. Another of the plaintiffs, a son, who lived in a distant state, had never visited his mother, nor had he written her for years before her death. The grantees were a son and daughter of the grantor. The son had lived with his mother for about a year before her death, and had assisted her and cared for her, but for several years prior to that time had been absent from home, and his location was unknown to his relatives. The daughter had for nine years lived just across an alley from her mother, and during all that time had been relied upon by her mother for aid and support. The grantor had not been satisfied with the amount of rent received for the land, had complained that it was insufficient to support her and her husband, and for several years before he died wanted her husband to sell the same. After her husband's death she mortgaged the land to pay debts, and would have sold it had she found any one willing to purchase. The justice who drew the conveyance, and took the acknowledgment, testified that the grantor was cheerful at the time, that he talked with her for about an hour in the absence of the grantees, and was not advised that anything

was wrong, and that the grantor hunted up an old deed from which to get the description of the property. It also appeared that the grantor had stated to several friends that she intended to give to one of the grantees the greater part of her property on account of her kindness to her. The consideration expressed in the deed was one dollar. *Held,* that the evidence failed to show that the deed was executed under undue influence.

2. ————: CAPACITY TO CONVEY: EVIDENCE. Evidence that the grantor could neither read nor write, nor count money; that she believed she could see fairies, conversed with them, set the table for them, and wanted to keep on the good side of them, and that she imagined she could see departed spirits, and called the attention of people to the spirits of her departed children, which she imagined she could see in the road; *held,* to be insufficient to show want of capacity in the grantor to convey in view of proof that in her business affairs the grantor was known to exercise judgment and reason.

*Appeal from Delaware District Court.*—HON. J. J. NEY, Judge.

THURSDAY, MAY 19, 1892.

THESE two causes were consolidated and tried together in the court below. They are actions in equity to set aside certain deeds executed by Margaret Walsh to Michael Walsh, her son, and to Mary Ann Adams, her daughter; also deeds made by the said Michael and Mary Ann to the defendants, Arbuckle and Miller, on the ground that the deed from Margaret Walsh was procured by undue influence. It is averred that Arbuckle and Miller took their deeds with knowledge of the fact that their grantors had acquired title by undue influence and fraud practiced on their mother. The defendants, Miller and Arbuckle, claim to have purchased in good faith, and for a valuable consideration, and without knowledge or notice that the title of their grantors was obtained by fraud or undue influence. The defendant, Walsh, was not served with notice, and made no appearance. The defendant, Adams, denies the allegations of fraud and undue influence, and avers that the conveyance was made

to her and Michael Walsh in pursuance of an oral contract, whereby they were to pay certain indebtedness then existing, maintain their mother (the grantor) through life, and at her death erect a monument for her and her husband, pay her funeral expenses, and pay each of the plaintiffs fifty dollars. That said contract has been carried out on their part, except the payment to the plaintiffs of fifty dollars each, which sum is paid into court for their use. The district court set aside the deed of Margaret Walsh in so far as the same conveyed any interest to Michael Walsh; also set aside the deeds from Michael Walsh and Mary Ann Adams and her husband to James Arbuckle and Frank Miller, so far as they convey any interest of Michael Walsh to Arbuckle and Miller. In all other respects it confirmed title in Arbuckle and Miller to the land conveyed to them, ordered that the money tendered by the defendant, Adams, be turned over to the plaintiffs, and taxed the costs to Mary Ann Adams. Mary Ann Adams, James M. Arbuckle and Frank Miller, the defendants, each separately appeal.— *Reversed.*

*Yoran & Arnold,* for appellants.

*Blair, Dunham & Norris,* for appellees.

KINNE, J.—The plaintiffs and the defendants, Mary Ann Adams and Michael Walsh, are children of Margaret Walsh, deceased. Less than two months prior to her death she conveyed eighty acres of land to the defendants, Mary Ann Adams and Michael Walsh, the consideration named in the deed being one dollar. The plaintiffs insist that this conveyance was procured by undue influence and false promises, and on the representation of the grantees that they would give the grantor a mortgage on the land for its full value,

which said grantees did not do. The defendants' contention is set out above.

The facts disclosed by this record are that Margaret Walsh was eighty years old or over, the evidence as to her exact age being indefinite; that her husband died about a year before she executed this deed; that Margaret Lewis, one of the daughters, had resided in Floyd county, Iowa, for two years or more. She visited her mother after her father's death, and wrote her two letters. Catherine McQuirk, another daughter, lived in Sioux county for twelve years, and never visited or saw her mother during all of that time. There is nothing to show that during this time she ever wrote to or in any way communicated with her mother. Ella Merry, another daughter, lived in O'Brien county for six years, and visited her parents four years ago. Martin Walsh has lived in California for about thirty years. He has never visited his mother, and, so far as appears, he did not write her for years before her death. Michael Walsh lived with his mother for about a year prior to her death, and cared for her and assisted her in her housework. For several years prior thereto he had been absent, and his whereabouts were unknown to his relatives. Mary Ann Adams had for the last nine years of her mother's life lived just across an alley from her. While the testimony is somewhat conflicting, it is clear that Mrs. Adams helped provide for her mother, assisted her in her house, and in every reasonable way ministered to her comfort and support. We have stated the situation of these children with reference to their mother quite fully, as to our minds it has an important bearing upon the question we must determine. It is clear that for the last nine years of her life, the daughter, Mrs. Adams, was constantly relied upon by her mother for aid and support.

I. A material question is as to the intention of Mrs. Walsh as to selling the land in controversy. It

1. CONVEYANCE:
undue influ-
ence: evi-
dence.

seems that at the time her husband leased the land to Miller she was not satisfied with the amount of rent to be paid. ' She and her husband 'wanted to sell the land at least three years prior to her death. She then complained that they were not getting enough out of it to support them. The plaintiff Lewis, in October, 1888, thought her mother had better sell the land, take the money, and use it. After her husband's death Mrs. Walsh borrowed money on the land to pay debts which had accumulated. During the holidays in 1888, she told John Lewis the farm did not bring enough to live on, and that she and Mike had tried to sell it, and could not find any one to buy. In January, 1889, she offered to sell it to the defendant Miller, but he thought her price too high. There is no question from the testimony but that the intent to sell this land had been in Mrs. Walsh's mind for several years, and it was not the result of the influence of any one. It is equally clear that originally she intended to give this land to the defendant Adams. She told Grimes so, and gave as a reason the absence in the west of the other girls, the fact that they paid no attention to her, did not help her, nor write to her. In a conversation with Mrs. Sloan the fall before her death, Mrs. Walsh spoke of Mrs. Adams' kindness in providing for her, and said she was going to give Mary Ann the biggest part of her property, on account of her kindness.

Was there any undue influence? We may say that much evidence was introduced which is incompetent, and cannot be considered. Mrs. Moreland testifies that deceased told her that Mike had threatened to kill her if she did not fix the property as he wanted, and that he and the defendant Adams were worrying her about the property. Mrs. Strader also testifies that Mrs. Walsh told her of Mike's threats. There is some testimony as to the desire of Mike to get the tenant,

Miller, off of the place, and that he and Mrs. Adams
wanted their mother to sell the land. The force of
Mrs. Moreland's testimony is much weakened by the
unhappy relations existing between her and Mrs.
Adams. Clearly there is no evidence which would
justify a court in saying that Mrs. Adams, so far as
she was concerned, obtained the conveyance through
the exercise of any undue influence.

It is insisted, however, that Michael, after he came
home, won his mother's confidence to such an extent,
and by such means, that the conveyance as to him was
properly set aside. There are, it is true, some circum-
stances which, in and of themselves, would seem to
point to the exercise of improper influence on his
mother by Michael in procuring this conveyance, but
viewed in the light of the circumstances surrounding
the execution of the conveyance, we do not think they
are sufficient to justify us in setting the deed aside as
to him. Wilson, the justice who made the deed, says
Mrs. Walsh was cheerful, like any lady of her age;
that it appeared to be her voluntary act and deed,—her
own choice. He was in the house an hour, and he
says during this time she took part in the conversa-
tions, talking intelligently and rationally. He says:
"There was not the least apparent effort on the part of
Mrs. Adams or Michael to induce her to make this
conveyance." If this deed had been procured by
undue influence, if the grantees were attempting to
induce their mother, against her will, to part with the
title, we do not think they would have proceeded in the
manner shown by the testimony. The scrivener was
not advised that there was anything wrong about the
transaction. It does not appear that Michael and Mrs.
Adams were present during all the time that the justice
was in Mrs. Walsh's house, talking with her, and pre-
paring the deed. The decedent got up from her chair,
and looked in her bureau drawer for an old deed to get

the description from. This was done on her own motion. From these and other facts we conclude that there was no undue influence used which resulted in the procurement of the deed from Mrs. Walsh. The question of consideration is only a circumstance to be taken into account with other facts and circumstances in determining whether the conveyance was procured through fraud and undue influence.

II.   Had the decedent the capacity to execute the deed?   She was at least eighty years old and infirm in body and mind.   "She had for a long time an hallucination that she could see fairies; conversed with them; set the table for them; thought sticks of stove wood fairies; wanted to keep on the good side of them; imagined she could see departed spirits, particularly of her children; imagined she could see their whitened bones, and could not be led to believe but that some of them were dead; called people's attention to seeing their spirits out in the road.   She was illiterate, could neither read, write nor count money."   It is insisted with much confidence that these and other facts show that the decedent was not competent to execute the conveyance in question.   This question may be determined from the testimony of those witnesses who are not interested in the event of this suit.   The record shows that many of the witnesses gave an opinion as to the decedent's mental unsoundness without disclosing any sufficient facts as a basis therefor.   The rest of them based their opinions chiefly on the facts above stated. The physician who attended the deceased in her last illness, and who had been her family physician for years, says she did not appear different from what people always do when suffering as she was.   He never observed anything in any manner indicating mental unsoundness.   Joseph Grimes, a citizen of excellent repute, had known the deceased since 1846.   He had

2. ——: capacity to convey: evidence.

for years been her trusted adviser. He had frequently drawn papers for her and her husband. He says they were both believers in spirits. He was present in January 2, 1889,—about two months before her death,—when a settlement was had with the tenant. His testimony shows she evinced a lively interest in the matter of the settlement, and called the attention of the tenant to certain things which he had agreed to do and had not done. He saw her also about a month before she died. She always did her own business. He says she always, in her business affairs, exercised judgment and reason, and he never heard her capacity to transact business called in question until after her death. This testimony is corroborated by several other persons well qualified to speak with accuracy concerning her mental condition. We cannot doubt, in view of the evidence, as to the interest, activity and knowledge of the deceased as to her business matters, that she possessed the capacity to make the deed. Many persons believe in spiritual manifestations, insist that they have communication and conversations with deceased friends, and the like; yet such things are not necessarily evidence of such a disordered mental condition as to show that those who hold such opinions are unfit to make a disposition of their property.

It follows from what we have said that the conveyance from Mrs. Walsh to Michael Walsh and Mary Ann Adams was valid, and hence we need not consider the questions raised as to whether the defendants Arbuckle and Miller purchased in good faith and without notice of Mrs. Walsh's mental condition. Even if Mrs. Walsh's mental condition was such as to render her incompetent to make the deed, still these defendants had no actual knowledge of it; and, if it be conceded that they had sufficient knowledge to put them upon inquiry to ascertain the facts, it is shown that they investigated the facts disclosed to them in good faith

and with diligence, and from such investigation they were warranted in believing Mrs. Walsh capable of conveying the real estate. Wade, Notice, sections 28, 29, 31; *Wilson v. Miller*, 16 Iowa 111. The evidence, to justify us in setting aside these deeds, should be clear, satisfactory and conclusive. It is not of that character. *Fifield v. Gaston*, 12 Iowa 218; *Parker v. Pierce*, 16 Iowa 227; *Ray v. Teabout*, 65 Iowa 157. The judgment of the district court will be reversed, except as to the amount tendered and paid into court, which will be paid over as directed by the district court, and the plaintiffs' bill will be dismissed at their costs. The cause will be remanded for judgment and decree in the lower court in conformity with this opinion. REVERSED AND REMANDED.