EDWIN HULT, Administrator, Appellant, v. HOME LIFE INSURANCE COMPANY OF NEW YORK, Appellee.

No. 41035.

JANUARY 12, 1932.

S. G. Van Auken and Davis, McLaughlin & Hise, for appellant.

Henry & Henry, for appellee.

GRIMM, J.—The record in this case consists of 1099 pages. More than 300 exhibits were used on the trial, many of which have been certified to this court. Manifestly, it will be utterly impossible, within the space ordinarily allotted to opinions, to do more than merely sketch an outline of the evidence in support of the controversy and announce our findings thereon.

Caroline E. Stockslager, who died in the city of Des Moines, Iowa, on the 24th of January, 1928, and who for brevity will hereinafter be referred to as "the deceased," had purchased from the defendant, through its agent, George E. Shepherd, at Jacksonville, Florida, annuity contracts of the number, date and amount as follows:

|   | Number | Date | Amount |
|---|--------|------|--------|
| 1. | 294,383 | Feb. 18, 1924 | $4,423.75 |
| 2. | 304,559 | Dec. 22, 1924 | 6,079.50 |
| 3. | 306,573 | Feb. 20, 1925 | 4,260.00 |
| 4. | 312,861 | Aug. 13, 1925 | 5,016.00 |
| 5. | 323,280 | May 19, 1926 | 5,687.50 |
| 6. | 333,849 | Feb. 24, 1927 | 3,130.00 |
| 7. | 342,398 | Sept. 15, 1927 | 2,304.00 |

$30,900.75

At the time of her death, the deceased had received, in annuity payments, on contracts Nos. 1 to 5 inclusive, the sum of $6,500.00. No payments had matured on contracts Nos. 6 and 7.

It is alleged that at the time of her death she was 72 years and 4 months of age.

The plaintiff, administrator of the estate of the deceased, by an instrument dated May 23, 1928, gave notice of rescission and cancellation of these annuity contracts, and tendered to the defendant company the contracts, "together with Six Thousand Five Hundred Dollars ($6,500.00) and interest paid to the deceased, Caroline E. Stockslager, and hereby demands of said Home Life Insurance Company of New York, Thirty Thousand

Nine Hundred and 75/100 Dollars ($30,900.75) with interest from the purchase of each of said bonds as above set forth."

The plaintiff demanded a cancellation of the contracts and decree and judgment for said $30,900.75, together with interest and costs.

It is claimed that the contracts were "unconscionable, fraudulent, void, inequitable and unlawful." It is alleged, in substance, that the deceased "was mentally incompetent to know the nature of the transaction or realize the importance of such alleged sale, and was not possessed of sufficient mind or reason to understand or comprehend the nature of her acts in connection with said alleged sale or the said alleged contracts." It is claimed that " for more than ten years prior to her death, the deceased was a confirmed paranoiac and was obsessed with an insane delusion or monomania to the extent that she believed that others, to your petitioner unknown, were trying to rob her of her property or involve her in vexatious litigation, all of which was unfounded, with no basis or foundation for any such belief." It is also alleged "that the defendant and its agents and representatives so ingratiated themselves into the confidence of the deceased that they dominated and controlled her will in the alleged sale of said contracts." It is also claimed "that the defendant with the aid of its agents and representatives during all the time of the sale of said contracts, and each of them, bore confidential, advisory and fiduciary relations with the deceased." It is alleged, in substance, that the deceased was led to believe that the contracts in controversy were in fact life insurance policies. It is also claimed that the contracts in question are in fact "wager contracts" and unlawful and contrary to public policy.

The answer is by way of a general denial, with some admissions and modifications.

Generally speaking, the grounds relied upon for reversal by the plaintiff may be classified into four groups:

1. That the court erred in failing and refusing to find and hold that Caroline E. Stockslager was, at the time the annuity contracts in controversy were issued, of unsound mind and incompetent to enter into such contracts.

2. That the court erred in failing to find that the deceased was, at the time of making the annuity contracts in controversy,

possessed of an insane delusion which influenced and caused her to enter into such contracts, by reason of which she was incompetent to enter into said contracts, and except for which said contracts would not have been entered into by her.

3. That the court erred in failing and refusing to find that the deceased entered into said annuity contracts by reason of weakness of mind and undue influence exerted over her by the defendant and its agent, George E. Shepherd.

4. That the court erred in failing and refusing to decree the annuity contracts in controversy wager contracts, unconscionable and against public policy.

The deceased was born in 1855. She had two brothers, one known as "E. O.," or "Lon," the other known as "S. O." E. O. Stockslager moved to California, where he died as the result of an accident in November, 1913. S. O. Stockslager, who was the deceased's sole heir at law, was a physician.

The deceased lived with her parents on farms in Cedar and Benton Counties, Iowa, and in the spring of 1890 removed with her parents to Des Moines, where her father, having retired from business, purchased a modest home. She continued to live with her parents until the time of their death. She was a typical example of the daughter of the household, who, while the others go out into the world for themselves, to adjust their own lives and carve out their fortunes, remains at home, to do the drudgery and give loving care and attention to the parents until they pass away, thus dedicating her life, in self-stultification and sacrifice, to her parents. She was not only the housekeeper and nurse, but also the business adviser of her father and mother. She was called upon to do all the work and bear all the responsibility of the home and of the property which sustained it. Her loyalty to her parents and their comfort and happiness deprived her of the ordinary outside associations of youth, and indelibly stamped upon her face the signs of seriousness, if not sadness. The parental fortune was not large, and she early acquired what might be termed "extreme habits of thrift and economy," habits which, in later life, furnished tempting opportunities for those who sought to prove her insane.

While she was thus caring for her parents, her brother "Lon" had gone to California, and "S. O.," after a successful practice in Boone, moved to Chicago, and then to Syracuse, New

York, where he was living at the time of the trial. Her father died in 1905, at the age of 80, and the mother died in 1907, at the age of 80.

It will thus be seen that, at the time the burden of housekeeping, nursing, and managing property for her parents had rolled from the deceased's shoulders, she had passed the meridian of life, being approximately 53 years of age. She never married.

The father left a will, which was never probated, but in which the deceased was named as executrix. He had executed and delivered a deed for the home at Des Moines, which apparently was the principal part of the estate, which deed was to take effect at his death, giving a life estate to his surviving widow. The property was to be divided evenly among the three children after the death of the widow. The widow left a deed by which the property was evenly divided.

The deceased was left in Des Moines, after the death of her parents, to take charge of this joint property which she did. It was finally sold and the proceeds divided.

It quite clearly appears from this long record that the parents realized that the deceased was entitled to special consideration at their hands by reason of the long continued services and devotion which had been given by the deceased to her parents. It appears that some money was given to the deceased by her parents, and she in turn had bought some land, and later other property. After disposing of the old homestead in Des Moines, she continued to look after these farm lands and make investments out of her small savings. She lived very frugally, worked very hard, gave great attention to details, and as a result, at the time of her death, she left an estate worth $30,000, besides having purchased the annuity contracts in controversy. This $30,000 will pass to the principal contender in this case, Dr. S. O. Stockslager, the surviving brother.

The record shows that for many years the deceased had been making financial contributions to her said brother, the doctor. Many other facts in this long history will be referred to in connection with the consideration of the claims of the appellant.

I. It is the claim of the appellant that, prior to and at the time the contracts in question were purchased by the deceased, she was laboring under insane delusions, the substance

of which was that her brother, Dr. S. O. Stockslager, desired to get her money and property, or commit her to an insane asylum, or in some way dispose of her so that he could get her property, and that, in order to avoid this, she purchased the annuity contracts. It is claimed she had a similar delusion as to the brother in California, and that it continued even after the latter had passed away.

What amounts to an "insane delusion," under the law of this state, has been fully set forth in a late case entitled Firestine v. Atkinson, 206 Iowa 151. Therein many of our former cases are reviewed. We quote briefly from the Firestine case:

"It is not easy to define the characteristics of an insane delusion. It is obvious that it must be something more than a mere mistake of fact, and also must be a belief that cannot be removed, at least permanently, by evidence. If the belief is based upon evidence, even though it be slight and insufficient, and the belief is erroneous, still it is not an insane delusion. In re Estate of Henry, 167 Iowa 557. * * * it has been held that, where a testator manifests a dislike for the natural objects of his bounty, based on an erroneous belief that such persons have been guilty of misconduct, and where such belief is not based on evidence, and cannot be removed by evidence, it may amount to an insane delusion."

In the same case, this court quoted with approval from Snell v. Weldon, 90 N. E. 1061 (Ill.) as follows:

" 'The establishment of an insane delusion involves proof that the testator in this case believed certain things concerning his son which did not exist; that he had no evidence on which to base such belief; that the things which he believed were false, and were adhered to by the testator after their falsity had been shown by reasonable evidence; that the things which the testator believed were such things as no person of sound mind would believe; that the testator refused to yield or give up such irrational belief, in the face of such reasonable evidence as would convince an ordinary sound and healthy mind; and, lastly, that the existence of such delusion was present in the mind of the testator and exercised a controlling influence over him at the time the will was executed.' "

In the same case, this court quoted with approval from 1 Underhill on the Law of Wills, Section 94, as follows:

" 'A mistake of fact, entertained by the testator as to the character and motives of a person who is his heir, which prompts and leads him to disinherit that person, or a strong and perhaps unreasonable prejudice against a person, is not *alone* an insane delusion, destroying testamentary capacity. Thus the fact that the testator believed that his relatives have ill-treated him, or that they are inimical to him, and have conspired to defraud him, and for that reason leaves his property to strangers, does not constitute an insane delusion, unless it appears that his belief was wholly without *any basis whatever*, and that the testator *obstinately persisted in it against all argument* which may have been employed to disuade him. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though, on a consideration of the facts themselves, his belief may *seem* illogical and foundationless to the court; for a will, it is obvious, is not to be overturned merely because the testator has not reasoned correctly.' "

Quoting from 40 Cyc., 1013, this court said:

" 'An insane delusion is a belief which has no basis in reason and which cannot be dispelled by argument.' "

This court also quotes approvingly from Schouler on Wills and Administration, Sections 162 and 163, as follows:

" 'Insane delusion should be distinguished from prejudice, or error, as well as from eccentricity. It differs essentially from some rational belief, not well-founded, however perversely the testator may have clung to it. * * * An ill-founded·belief, not actually insane, does not destroy testamentary capacity. And where one indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence no matter how slight or inaccurate, his will cannot on that account be overturned.' "

In Lockie v. Estate of Baker, 208 Iowa 1293, this court said:

"The establishment of an insane delusion, as applied to this case, involves proof that the testatrix believed certain things

concerning the taking of the plaintiff's property by her husband, which was a mistake, and that she had no evidence whatever upon which to base such belief; that the things which she believed were false, and were adhered to by the testatrix after their falsity had been shown by reasonable evidence; that the things which the testatrix believed, were things that no person of sound mind would believe; that the testatrix refused to yield or give up such irrational belief, in the face of such reasonable evidence as would convince an ordinary, sound, and healthy mind; and lastly; that the existence of such delusion was present in the mind of the testatrix and exercised a controlling influence over her at the time the will was executed."

Many other cases might be cited from this and other jurisdictions in support of the foregoing definition. The record in this case fails utterly to meet the foregoing requirements.

Rare skill and diligence have been displayed in marshalling bits of evidence in the life of the deceased, in an effort to prove that she was laboring under an insane delusion. Unfortunately, she was not present to testify in denial or explanation of any or all of these isolated bits of evidence.

A very careful examination of the entire record furnishes abundant foundation for the belief that the deceased was not always fairly treated by her brothers, or at least that she honestly believed she had not been fairly treated by them. There is evidence in this record tending to show that she had been told by those in whom she had confidence (not agents or representatives of the defendant company) that she had not been properly treated by her brothers. For illustration, she herself has left behind her unmistakable evidence of her disapproval of the conduct of her brothers when they left her to care for the old home in Des Moines, without compensating her for either her time or for much of her personal outlay in connection therewith.

The manner in which a trusteeship to hold the title to the said Des Moines property, pending sale, was set up, and various other items in connection therewith, lead clearly to the conclusion that she felt wronged by her brothers in connection with that property. In fact, it appears she had reason to believe that her parents intended that she should have all of the proceeds of the sale of the homestead, as a partial reward for the services she had rendered her aged parents. Contrary to this hope and

expectation on her part, her brothers demanded and received their proportionate share of the proceeds of the sale of the property.

The deceased suffered two distinct periods of illness, one in 1913 and another in 1916. In the summer of 1913, she received an accident in an elevator in a Des Moines hotel where she was then living. She spent some time in hospitals in Des Moines, and thereafter went to her brother, Dr. S. O. Stockslager, who was then occupying a cottage at Lake Okoboji. She undoubtedly was unduly alarmed about her physical condition at that time. She dressed in an extremely "old-fashioned" manner. She wore her clothing a long time. She was then about 60 years of age. She was always extremely frugal and economical. She had lived a rather secluded life, in the shadow of her aged parents, devotedly attending to their wants and looking after their property interests. In the meantime, the doctor had been a successful practitioner. He had been in constant touch with the swirl of modern society and its gay costumes, and resented, to some extent at least, his sister's appearance and her undue alarm about her physical condition. At all events, the doctor himself says, in his testimony, that she left his cottage at Lake Okoboji without saying good-by, and complained that she had been treated badly. He denies that he mistreated her or threatened her. Her speech and conduct thereafter speak rather eloquently of her experience.

Great stress is laid by appellant upon the fact that on one or two occasions, in speaking generally on the subject, the deceased referred to her "brothers," although one of them had previously died. Undoubtedly, she was much impressed and often thought of what came to her from her brothers or otherwise concerning what had been their attitude towards her while both were living. Even though she may have been mistaken about some matters arising out of her relations with her brothers, nevertheless the appellant has failed to bring his case within the rules hereinbefore set forth. There is nothing to show that her beliefs "were adhered to by the testator after their falsity had been shown by reasonable evidence; that the things which the testator believed were such things as no person of sound mind would believe; that the testator refused to yield or give up such irrational belief, in the face of such reasonable evidence as

would convince an ordinarily sound and healthy mind." See Snell v. Weldon, 90 N. E. (Ill.) 1061.

Moreover, in Mitchell v. Mutch, 180 Iowa 1281, l. c. 1289, this court said:

" 'If delusions be relied upon, it must be shown that they influenced the party to such an extent that he had no reasonable conception or understanding of the true nature and terms of the contract.' Mathews v. Nash, 151 Iowa 125, 127; Swartwood v. Chance, 131 Iowa 714; Reese v. Shutte, 133 Iowa 681."

Here, again, the appellant has failed to bring his cause within the requirements of the law.

An extensive correspondence passing between Shepherd, the agent of the defendant company, and the deceased, has been introduced into the record. It would unduly extend this opinion to quote therefrom, but a careful analysis of it all abundantly satisfies us that the deceased had a "reasonable conception and understanding of the true nature of the terms of the contract." In fact, it is noticeable that the correspondence on the part of the deceased showed not only commendable caution, but unusual understanding and conception of the purposes and terms of the contract.

The record abounds in the recitation of statements made by her prior to or about the time of the making of some of these contracts concerning the reason for making the contracts. A careful examination of the entire record gives the reader a picture of a woman who had struggled all her life, first in caring for her aged and decrepit parents, then in handling the small property that was left, and subsequently in handling her own property. The record shows she was leasing some farm property concerning which she had a great deal of trouble. She realized that she was growing old. She had experienced some accidents and some illness. Her brother, instead of being helpful and a comfort, was a drain on her resources. She had no family ties of any consequence to her. She was rather growing old among strangers, and apprehensive of the time when, by reason of a combination of old age and illness, she might not be able to properly care for her property, and she would be left without proper means of support or medical and hospital attention. Discreetly, cautiously, prudently, she scanned the field, and

finally determined to transfer sufficient of her property into annuity contracts which would assure her, during the balance of her natural life, a sufficient annual income so that she might have whatever the exigencies of old age might require in the way of living expenses, medical bills and hospitalization.

We find she was not suffering from any insane delusion which prevented her from having a reasonable conception or understanding of the true nature and terms of the contracts which she made and which are here in controversy. The appellant has failed to show that the deceased was suffering from any such delusion as, in contemplation of law, would render her incompetent to enter into the said contracts.

II. It is claimed by the appellant that the deceased was of unsound mind and incompetent to enter into these contracts.

In order to find for the appellant and set aside these contracts, the evidence in support thereof should be clear, satisfactory and convincing. See Lewis v. Arbuckle, 85 Iowa 335, l. c. 343; Fifield v. Gaston, 12 Iowa 218; Parker v. Pierce, 16 Iowa 227; Ray v. Teabout, 65 Iowa 157. As was said in Albaugh v. Shrope, 197 Iowa 844 (l. c. 857):

"The plaintiffs have the burden of establishing the mental incapacity of the deceased, and this they must do by proof that is clear, convincing, and satisfactory, before her deed can be set aside on that ground. Sutherland St. Bank v. Furgason, supra, and cases cited."

See also Overmyer v. Overmyer, 191 Iowa 1011. Many other cases might be cited.

The evidence in support of this claim of insanity by the appellant has taken a wide range and covers a long period of time. No attempt will be made to even refer to all of it, much less comment upon it. We will use only a few illustrations of the character of the claims made and the evidence in support thereof.

Much is made of the appearance and personal characteristics of the deceased. Many witnesses testified to her manner of dress, her economy, her mode of living, the class of hotels and boarding houses in which she lived, and the economy with which she moved about generally.

There is a sharp conflict in the evidence upon many of the matters urged by the appellant. For illustration, some of the witnesses on behalf of the appellant claim that the deceased was seized with melancholia; that she rarely, if ever, smiled; that she was morose and more or less despondent. Witnesses on behalf of the defendant sharply contradict this testimony, and it is asserted by those who had good opportunity to know, that, while she was a quiet, mild-mannered woman, serious-minded, and perhaps at times unduly alarmed about the condition of her health or her financial troubles, nevertheless she had a keen sense of humor, and when not too seriously engaged in troublesome business affairs, was jovial and happy.

It clearly appears, as previously indicated, that she paid no attention to mode or fashion. She was extremely economical in her dress and in her living expenses. It is manifest that she was of a secretive turn of mind. She spent a great deal of time in considering her business affairs. She consulted with various business men and sometimes with ladies of her acquaintance about her business affairs and business generally, and the final answer to all the charges of insanity and mental incompetency made against her is that, in all her purchases of stocks, bonds, land and other property, she seldom, if ever, lost, and managed to accumulate an estate of approximately $60,000, and that entirely out of investments, and without any business of any kind.

It is true that she worried, perhaps somewhat unduly, about her difficulty with her farm tenants, yet there is abundant reason in the record for worry on her part. Perhaps she spent too much time checking up on prospective investments, nevertheless she displayed keen, discriminating judgment in her purchases. For instance, she preferred and demanded tax-exempt securities, and it is significant that in her estate no evidences of "wildcat" investments were found. Furthermore, no mining stock, no stock of companies dealing in speculative lands, no stock in such ventures as the "Associated Packing Company" and other such promotional schemes, were found in her assets. She fully realized that she was almost entirely alone in the world; and out of an abundance of precaution, with skill and acumen of a high order, she set about cautiously, but understandingly, to find for herself, as a precaution against the needs of old age rapidly creeping on, an investment which would assure her not only the

reasonable necessities of life, but such added expenses as illness and old age might require. Thus did she intelligently and successfully, alone, fight the battle to maintain herself and save her property.

It abundantly appears that she kept herself well informed on current topics, including politics and questions pertaining to agriculture. She had an excellent memory. Several witnesses testified in detail about the extent to which, from one interview to another, she could remember the merest detail of previous conversations. Many of her letters are eloquent and persuasive of her keen perception and comprehensive understanding of the subject in hand.

In passing, it may be noted that, from time to time, she purchased from the Iowa Loan & Trust Company $15,000 or $16,000 worth of special assessment certificates. She preferred those because they were tax-exempt securities. From the Central Trust Company of Des Moines she purchased from $25,000 to $30,000 worth of municipal bonds; from the Security Loan & Investment Company, $9,000 or $10,000 worth of special assessment certificates. She made other similar investments from time to time. She was keen enough to see the impending danger of bank deposits, and at the time of her death was found to have deposits in three or more banks in Iowa, Florida and Pennsylvania. Her farming operations extended into two or more states. Her farm investments were, on the whole, profitable.

This court, in Coughlin v. St. Patrick's Church, 201 Iowa 1268, in an action in equity by the heirs of a grantor to set aside certain conveyances of real estate, on the grounds that the same were obtained by undue influence and that the grantor was mentally incompetent to execute the same, set forth a recitation of facts much stronger and far reaching than the record presented in the case at bar, but, reversing the lower court who set aside the conveyances, this court said, among other things:

"But a disposition of one's property is not to be set aside on the ground of mental incapacity unless the evidence is of such a character as to convince and satisfy a court of equity that the grantor was so lacking in mental ability that he could not reasonably exercise judgment and discretion in regard to the particular business in hand. The shrewdness and alertness of strenuous business competition are not required. Men in good

mental condition err in judgment in business transactions, and it is not unknown that financial disasters frequently result. Business transactions are often ill-advised; and no hard and fast rule can be laid down by which to measure the exercise of judgment and discretion by one in disposing of his property. We are convinced from the record in this case that the grantor was eccentric and peculiar. He did erratic things through his life; but the greater weight of the testimony convinces us that he was a shrewd and careful man in a business transaction. He was zealous in guarding his own rights, and perhaps too exacting in demanding that to which he was entitled.''

See also Lewis v. Arbuckle, 85 Iowa 335; Albaugh v. Shrope, 197 Iowa 844; Overmyer v. Overmyer, 191 Iowa 1011. See also Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. Ed. 112.

Every case of this kind must necessarily rest upon its own peculiar facts. No reasonable quotation can be made from this very extended record. Suffice it to say that the entire record has been carefully examined, and we unhesitatingly reach the conclusion that the plaintiff has utterly failed to show mental incapacity or unsoundness of mind on the part of the deceased of such a quality or to such an extent as is required before an executed contract will be cancelled on account thereof. Moreover, we reach the conclusion that, while the deceased had many peculiarities and personal idiosyncracies, yet it satisfactorily appears that she fully understood what she was doing when she purchased the contracts in controversy. She had a perfectly rational basis for her conduct and fully understood the consequences thereof.

III. It is strenuously urged by the appellant that the defendant, through its agent Shepherd, exercised an undue influence over the deceased, thereby securing the purchase by her of the contracts in controversy. Upon this subject of undue influence, this court has frequently spoken. We will not undertake to cite all the cases, but will quote from only a few.

In Reeves v. Howard, 118 Iowa 121 (l. c. 127), this court said:

''The mere fact that Howard may have been sick in body or weak of mind when he made the conveyances is not enough to

904

justify us in setting them aside. Marmon v. Marmon, 47 Iowa 122. It must further appear that there was exercised upon the grantor such improper or wrongful constraint, or machination, or such urgency of persuasion as to overpower his will, and induce him to do that which he would not have done if left to act according to his own will and desire. In other words, influence, to be undue, must be such as, in effect, destroys the free agency of the person acted upon, and substitutes the will of another person for his own. Schmidt v. Schmidt, 47 Minn. 457 (50 N. W. Rep. 598); Haydock v. Haydock, 33 N. J. Eq. 494; Elkinton v. Brick, 44 N. J. Eq. 165 (15 Atl. Rep. 391, 1 L. R. A. 161); Eckert v. Flowry, 43 Pa. St. 46; In re Carroll's Will, 50 Wis. 437 (7 N. W. Rep. 434); Pomeroy, Equity Jurisprudence (2d Ed.) 951, note 1.''

See also Sutherland State Bank v. Furgason, 192 Iowa 1295; In re Estate of Townsend, 128 Iowa 621; Henderson v. Jackson, 138 Iowa 326; Stonewall v. Danielson, 204 Iowa 1367.

It will be borne in mind that this case is distinguished from many found in the books because Shepherd, the agent who acted for the defendant in the sale of these various contracts, was not dealing for himself. He gave no annuity contract of his own, taking property in consideration therefor. His entire consideration in the transaction was merely the ordinary commission afforded any agent under similar circumstances. The defendant company, as the record shows, was extensively engaged in the sale of these contracts. It was a New York concern, which was specifically authorized by its charter to write annuity contracts, and was doing business in the state of New York under the supervision of its proper authorities. It appears without contradiction that sufficient reserve had been set aside with which to pay these annuity contracts; that the entire transaction was open and aboveboard, under state supervision, upon a general plan, based upon the tables of expectancy of life and rates approved by the New York insurance authorities.

According to the "dramatis personæ" in this case, the agent Shepherd, at Jacksonville, Florida, is the villain in the play.

In the first place, it must not be overlooked that, prior to the time the deceased ever met Shepherd, she had, on several occasions, talked to her friends about purchasing annuities. At

first, she considered annuity contracts from hospitals and educational institutions. One of the principal witnesses for the plaintiff dealt with her for some time, seeking to secure from her a contract by the terms of which an organization in which he was interested would sell her an annuity contract; but with characteristic caution and circumspection of mind, she apparently concluded that such a contract would not be safe, and sought elsewhere for a more satisfactory contract of that character.

She frequently went south for a short interval in the dead of winter, and at times traveled in the east, to see some distant relatives. It will be noted, however, that these trips were always with the greatest economy. It was on one of these trips to Jacksonville, Florida, that, in December, 1919, she called on Shepherd at his office in Jacksonville. Shepherd was a witness, in person, at the trial. His testimony covers approximately 100 pages of abstract. Approximately 60 letters passed between Shepherd and the deceased, most of which were introduced in evidence. The parties first met at the office of Shepherd, where the deceased had gone, unsolicited, in order to inquire about annuity contracts. Later, Shepherd sent her a specimen policy, and informed her about taxes. This first visit was in the latter part of 1919 or the early part of 1920. From Hanover, Pa., she wrote Mr. Shepherd a long letter, in which she asked some very pointed questions, evincing a very clear and comprehensive understanding of annuity contracts. On August 9, 1920, she returned the specimen copy of the contract which had been forwarded to her by Mr. Shepherd. The correspondence continued until June, 1921, when from Des Moines, Iowa, the deceased wrote Shepherd, requesting an application blank for an annuity contract. In this letter, she said, among other things:

."Does your company have certain districts for each agent to control and do its work in? If so, we can leave it until I come south in the fall, as I do not want to risk the least irregularity with an Insurance Co."

Shepherd answered under date of June 30, 1921, in which he said, among other things:

"In reply will say as the time between now and fall is rather short, I would suggest that you wait until you return South this winter and let us go over the matter fully with you

as a thorough understanding by us of what you need to suit your convenience and a thorough understanding by you of what the contract you select is essential for the mutual satisfaction of all concerned. However, should you desire to act earlier in the matter we will take pleasure in forwarding you the necessary application blanks to be completed. If the contract is issued in Florida, it will be exempt from taxation both Federal and state taxes as the State of Florida cannot levy an income tax without amending the present Constitution of this State and such an amendment would be almost impossible."

Several interviews and much correspondence passed between the parties, and finally, on February 18, 1924, about four years after her first visit, the first contract was issued. It appears that during all of this time Shepherd never called on her. She always called on him at his place of business. The testimony of Shepherd is voluminous, as are the exhibits. It is impossible to quote from either. Suffice it to say, the entire record has been carefully examined, and we unhesitatingly reach the conclusion that there was no undue influence exercised by Shepherd in procuring the sale of any one of the contracts in controversy. It is true that she expressed a desire that the entire matter be treated as a secret. In this she acted no differently than she did when she purchased bonds or other securities from the banks in Des Moines, or made any other kind of investment, regardless of the character thereof. She acted no differently with Shepherd than she acted with all her friends and acquaintances in Des Moines and elsewhere, with whom she did business. She was of a secretive turn of mind, and desired everything kept secret.

Shepherd was not only in the insurance business, but also in the real estate business. The Florida land "boom" was on in full blast, but he sold her no Florida land. There is not a scintilla of evidence even tending to show that Shepherd undertook to sell her anything for which she did not herself inquire, nor did he use any persuasion or other business methods other than those ordinarily used in the proper transaction of such business.

It is apparent from the entire transaction, as revealed in the record, that the prime purpose the deceased had in mind in her transactions with Shepherd, and in fact in her negotiations to secure an annuity contract before she met Shepherd, was to provide for herself, in her declining years, an absolute, assured,

definite income, upon which she could always depend, relieved from the annoyance, vexation and disappointment of endeavoring, herself, to transact the business necessary to exact from her estate a proper return.

During the negotiations leading up to the execution of the contract, Shepherd advised the deceased to make inquiry concerning him at any of the banks in Jacksonville. The record shows that she made some such inquiries, and seemed entirely satisfied.

At the time of the trial, Shepherd had ceased representing the defendant company. His only interest in the company at that time was that of a few "renewals" for business previously placed on the company's books by him.

There is no evidence in the record showing that Shepherd did anything in connection with the sale of the annuity contracts which could in any manner be construed to be the exercise of undue influence over the deceased. The correspondence shows a well formulated plan on the part of the deceased and a determination on her part to carry the same out in accordance with her own views, regardless of what anybody might think to the contrary.

It must be recalled that the deceased never married. Her father and mother had long since passed away. She had no direct dependents. True, she had from time to time contributed to the support of her brother, the doctor, but he had no legal claims upon her. She had a perfect right to dispose of her property as suited her best. After much deliberation and investigation, covering a period of years, she invested about half of her property in a manner which relieved her entirely, for all time to come, of any anxiety as to her support and care, and she still retained about $30,000 which the complaining and dissatisfied brother has received from her estate.

It is claimed by the appellant that an unconscionable advantage was taken of the deceased by selling her the contracts in controversy. We see no support in the record for this contention. In the first place, it must not be overlooked that the rates were regulated by the Insurance Department of the state of New York. Moreover, the comparative table which appears in the record discloses that the contracts in controversy were as liberal or more liberal to the annuitant than those issued by

many other companies similarly engaged in business, and that the New York Insurance Department has recommended a change in rates more favorable to the company.

It will be noted that 6% interest, net, on the total purchase price of the annuities in controversy, would be $1,854 a year. Under the terms of the contracts, the deceased was receiving $3,700 annually, and she would have continued to receive said amount each year of her life, no matter how long she might have lived. The record tends to show that the deceased was receiving annually a rate of from 11.3% to 13.2% per annum on the purchase price of the contracts, and by the terms of the contract she was to receive that rate of interest during the balance of her natural life, regardless of how long she might live. Had the deceased lived ten years, she would have actually received from the company more than the original purchase price of the contracts. Aside entirely from the question of the amount received, one of the important considerations passing to the deceased was the security which she obtained in the contracts. By these contracts, $30,000 of her estate was placed in the hands of others to be operated. She was relieved of all the responsibility, worry and risk of loss, and was guaranteed, annually, approximately 12% upon her investment. This relief from anxiety, worry and labor, coupled with the certainty of support which the contracts gave to her, removed the contracts entirely beyond the realm of questionable advantage to the insurance company.

It abundantly appears in the record that the rates are based upon an experience table of mortality. With amazing accuracy, actuaries are able to determine the amounts which can be paid, in the form of annuities, to people of certain age, for a given specified sum. The contracts in question were so determined. It is a matter of common knowledge that great numbers of such contracts are in existence. It is difficult to conceive how the deceased could have, in a better way, protected herself than by having purchased these contracts. She was getting along in years. The physical frailties incident to age were creeping upon her. The uncertainty of her future needs faced her. She had no dependents. It remained for her to take care of herself only as best she could. She displayed excellent judgment in purchasing the contracts in controversy, by which she was relieved of the worry and responsibility of keeping invested $30,000 of her

property, and at the same time secured for herself, with absolute certainty, annual payments much more than she needed, except for the extraordinary expenses incident to emergencies, such as ill health. The fact that she died soon after the contracts were taken out has no bearing on the question under consideration. She might have lived ten or even fifteen years longer, in which event the contracts would have been unprofitable to the insurance company, instead of profitable, as they turned out to be. This was one of the risks and hazards assumed by the insurance company. This is one of the elements entering into the computation of the rate.

Experience has shown, particularly in the last few years, that even those who consider themselves skilled in investments have found it impossible to recover reasonable rates of interest on their investments, and equally impossible to save much, if any, of the principal. With her annuity contracts in her possession, the deceased was relieved of all worry about interest, and likewise all worry about her original investment. Both were secured to her for the entire period of her life, whatever it might prove to be.

IV. It is strenuously contended by the appellant that the annuity contracts are "wager contracts," and therefore void as against public policy. Here, also, the appellant is in error.

Reference is made to the well-known rule that a life insurance contract must be based upon an insurable interest, in the absence of which it becomes a wager contract. That rule has no application to the case at bar. If a person takes out a life insurance policy on the life of one in whom he has no insurable interest, there are three parties involved: First, the party who procures the insurance; second, the insurance company; third, the party insured. Not so in this case. Here, there are but the two parties, the one to whom the contract runs and the insurance company, which makes the contract. There is here no disinterested third party, whether viewed as an annuity contract or an insurance contract.

Certainly the deceased had an insurable interest in her own life. Moreover, it clearly and unmistakably appears in this case that the contracts in controversy were procured in good faith, and not for the purpose of speculating upon the hazard of a life in which the insured had no interest. The rates were actuar-

ially determined upon experience tables of mortality. The forms of the contract and the rates were supervised by state inspection and rulings.

We quote the following from Connecticut Mutual Life Insurance Company v. Schafer, 94 U. S. 457:

"It is well settled that a man has an insurable interest in his own life, and in that of his wife and children; a woman in the life of her husband; and the creditor in the life of his debtor. * * * The essential thing is, that the policy shall be obtained in good faith, and not for the purpose of speculating upon the hazard of a life in which the insured has no interest."

There was here no element of wager. The deceased in good faith, for a valuable consideration, entered into a contract with the defendant whereby the defendant agreed to pay to the deceased, annually, a stipulated sum, regardless of how long the deceased might live. The value of such a contract to the deceased, under the circumstances which surrounded her at the time she took these contracts, has already received our consideration. As was said in Curtis v. New York Life Insurance Co. (Mass.), 104 N. E. 553:

"And one of the well-known forms of contract is that of annuities—not within the technical meaning of the term. * * * but in the modern sense of a simple promise to pay a certain amount yearly. There is nothing in such contracts that offends against public policy or any principle of law."

In Mutual Life Insurance Company of New York v. Smith, 184 Federal, page 1, the court had under consideration "deferred annuity" contracts. In that case, the court said:

"* * * we see very little to be urged against insurance of the nature in question, and, indeed, that does not go to the merit of the insurance itself. It is not unnatural that one should act upon the idea that, in the days when he is handling money, it is the part of wisdom to safeguard the period of old age, in which business and earning capacity will have become a thing of the past. Under modern conditions in the various industries, as well as in business and in official life, men are influenced to enter upon a particular work by various old age safeguards which become operative at the end of a specified period of service."

See also Curtis v. New York Life Insurance Co. (Mass.), 104 N. E. 553. Other cases might be cited.

The contracts under consideration contain no element of wager. True enough, the length of life of the annuitant is uncertain. So it is in any form of life insurance contract, clearly within the law. It was entirely legal for the deceased to buy from the defendant an agreement whereby for a consideration the defendant promised to pay annually, during the entire life of the annuitant, a certain amount of money. It was a prudent and businesslike thing for the annuitant to do. It was a reasonable and proper undertaking for the defendant, based upon a consideration, lawful and actuarially sound.

Many other minor questions have been vigorously and skillfully argued. For illustration, it is claimed that a "confidential relationship" existed between Shepherd and the annuitant, and that the annuitant understood she was purchasing an ordinary insurance contract. We think that these and all similar questions are completely answered by what has been hereinbefore said. We may say, however, that nothing appearing in the record concerning the relations between Shepherd and the annuitant can be construed to constitute a confidential relationship, as the term is used in the law. Shepherd was merely providing annuity contracts to the annuitant at the annuitant's request.

It clearly appears from the correspondence of the deceased and otherwise in the record that the deceased fully comprehended and understood that the money she paid for these annuity contracts was forever lost and not to be returned at her death like the proceeds of an insurance contract.

All the questions raised by the appellant have been carefully considered.

We agree with the ruling of the trial court, and it follows that the cause must be, and is,—Affirmed.

All Justices concur.