Robert A. MOSES and Richard P. Moses, Executors of the Estate of Mrs. Miriam B. Moses, Deceased, Plaintiffs,

v.

The MANUFACTURERS LIFE INSURANCE COMPANY, a Canadian Corporation, Defendant.

Civ. A. No. 66–861.

United States District Court
D. South Carolina,
Columbia Division.

April 29, 1968.

Philip Wittenberg, Levi & Wittenberg, Sumter, S. C., for plaintiffs.

Marion Moise, Lee & Moise, Sumter, S. C., for defendant.

DONALD RUSSELL, District Judge.

Following denial of its motion for a directed verdict and a jury verdict

in plaintiffs' favor, the defendant has renewed its motion by way of motion for judgment n. o. v. In considering such motion for judgment in accordance with the defendant's prior motion for direction of verdict, all issues of fact, as well as inferences therefrom, are to be viewed in a light most favorable to the position of the plaintiffs. Fortunately, for purposes of this motion, there is no real dispute of fact involved.

Some twenty years prior to her death, the testators' testatrix purchased an annuity contract of the defendant. Such annuity contract, as extended, matured on December 12, 1965. At maturity, the contract provided certain alternative methods of settlement, exercisable at the sole option of the annuitant. Among such alternatives were (1) a single, flat cash payment, (2) a fixed monthly payment to the annuitant for life without other benefits, or (3) a fixed monthly payment to the annuitant for life, but, in any event, guaranteed for ten years. There was a small difference in monthly payments between the two latter alternatives.

Some months before, and in anticipation of, the maturity of the contract, the testatrix-annuitant wrote the defendant (a Canadian corporation):

"A few years ago we were in correspondence about the above annuity policy which I extended and expanded (Dec. 60 to Dec. 65).

"Since I have no desire to drive right up to the closing date, I thought some authorization might be made now, effective on the maturity date which is, I believe Dec. 12, 1965.

"I should like a straight annuity (10 year guarantee) which I believe is the usual contract.

"Will you be kind enough to tell me:

"a. Is income paid monthly, quarterly or annually, and is there any difference in the annual amount, or is there a charge for frequent payments which does not prevail on an annual payment?

"b. Is there any difference in the amount if I do not elect the 10 year guarantee, but just keep it a straight annuity, ceasing at my death?

"c. Is the figure of $87.63 (a figure given Nov. 29, 1960) still accurate, or has there been any change?

"Any information you can give me about this would be appreciated. Also any other information which you feel is pertinant and which I should have would be more than welcome.

"I am totally unfamiliar with these things, and I thank you for your help."

By reply of September 9, 1965, the defendant first pointed out to the testatrix-annuitant that at its maturity the cash value of her annuity would be $18,-410. It then, in response to the annuitant's specific inquiry, gave the different monthly sums which would be paid if the annuitant chose to take settlement in the form of either monthly income for life unguaranteed or monthly income for life but guaranteed, in case of annuitant's earlier death, for ten years.

Following receipt of this letter, the testatrix-annuitant wrote the defendant on November 21, 1965, inquiring specifically as to the meaning of the word "unguaranteed". She states that she is interested "in either the 104.94 (unguaranteed monthly) or the 102.54 (monthly guaranteed 10) but wish(ed) to know the advantages and/or disadvantages of one over the other."

The defendant's reply to this inquiry was, in part:

"In reference to your letter of Nov. 21st, I wish to advise you that if you select $104.94 a month unguaranteed under the alternate basis this means that you will receive a monthly income for as long as you live, but upon your death no monthly income payments will be paid to a beneficiary.

"If you select $102.54 monthly with a Ten Year Certain guarantee that means that you will be paid a monthly life income until the time of your death. However, should you die within the first 10 years of receiving

monthly income payments, the payments will continue for the balance of the 10 year period to your named beneficiary."

The testatrix-annuitant thereupon signed her option selection, designating "Option Selected Life Pension, Unguar. as indicated in correspondence." The option form, also, was checked opposite the choice described as "(2) Payable for life without refund on Annuitant's death."

It is clear from this correspondence (which, incidentally represented the only communication between the annuitant and the defendant relevant to the subject of this action) and from the option selection form, that the testatrix-annuitant freely and of her own volition chose a monthly payment, for her life, without guarantee for any payment beyond her own life. After receiving seven monthly payments under the form of settlement chosen by her, she died on June 12, 1966. The plaintiffs, who are the executors of her estate, then filed this suit for the purpose of voiding the election made by the testatrix-annuitant herself and of recovering at least the amount which would have been received by them as executors, if their testatrix had elected to take a "guaranteed" form of settlement.[1]

■ To rescind and void the election made by the annuitant herself, it is necessary for the plaintiffs to establish: (1) That the annuitant was incompetent at the time she made her election; or (2) That her election was induced by fraudulent misrepresentation on the part of the defendant; or (3) That there was a fiduciary relationship between the testatrix-annuitant and the defendant and that it was the duty of the defendant as fiduciary to see that the election made by the testatrix-annuitant was the one most favorable to her, considering both her financial and physical condition.

■ The plaintiffs do not contend that the testatrix was of unsound mind. The extent of their testimony is that she was not skilled in business matters and often consulted her brother-in-law in connection with business matters. There was absolutely no evidence, such as that in Allore v. Jewell (1876) 94 U.S. 506, 24 L.Ed. 260, that at the time she made her election she was "in a condition of great mental weakness." She was, it was conceded, a woman of talent, who had enjoyed a profitable career as a writer. Her letters to the defendant, incorporated in the record herein, indicate that she understood the several alternatives available to her by way of settlement of her annuity contract. They are not the letters of one who lacks the comprehension to understand her rights. She was clear in her own mind what type of settlement she wanted. There is thus nothing in this record to support the conclusion that the testatrix-annuitant's election should be voided for incompetency. Hult v. Home Life Ins. Co. (1932) 213 Iowa 890, 240 N.W. 218, 223; Richardson v. Travelers Ins. Co. (1912) 109 Me. 117, 82 A. 1005, 1008.

Equally untenable is any claim that the defendant was guilty of any deception or fraud in inducing the testatrix-annuitant to select the form of settlement that she did. The letters of the defendant show indisputably that it fairly stated to the testatrix-annuitant exactly what were her options. The plaintiffs point to no misrepresentation or concealment by the defendant, inducing the testatrix-annuitant in her selection.

■ The real heart of plaintiffs' claim is their contention that the defendant stood in a fiduciary relationship to the testatrix-annuitant.[2] Such claim of fiduciary relationship, however, cannot rest upon the mere relationship of insurer and insured. Rishel v. Pacific Mu-

---

1. In their original complaint, plaintiffs sought both actual and punitive damages. At the trial, however, they reduced the scope of their action to that stated.

2. In fact, the plaintiffs planted their whole case on this theory during trial. In a

colloquy with the Court, this was clearly stated. This colloquy was as follows:

"THE COURT: As I construe the plaintiff's case, the only ground the plaintiff has for recovery is the contention that the language appearing on the

tual Life Ins. Co. (C.C.A.Colo.1935) 78 F.2d 881, 886, 131 A.L.R. 414; Stockett v. Penn Mutual Life Ins. Co. (1954) 82 R.I. 172, 106 A.2d 741, 744; Hult v. Home Life Ins. Co. (1932) 213 Iowa 890, 240 N.W. 218, 228. The plaintiffs apparently recognize this and urge that certain language incorporated in a notice printed on the outside of the annuity contract created a fiduciary relationship between the testatrix-annuitant and the defendant. This language is:

"IMPORTANT

"When it is desired to obtain payment of any benefit under this contract write direct to the Manufacturers Life Insurance Company, Toronto, Canada, or communicate with the nearest authorized representative of the Company. By so doing time and expense may be saved, as the Company will furnish, free of charge, the required forms for completion together with any necessary advice and instructions.

———

"Making a change in a contract or replacing a contract by a new one does not usually result in any advantage to the holder of the contract. The Company strongly urges that, before taking any action in regard to a contemplated change in, or replacement of, this or any other contract, the counsel and advice of the Company which issued the contract should be secured."

■■ In my judgment this language did not create a fiduciary relationship between the defendant and the annuitant.[3] When requested, the defendant was obligated to be accurate and fair in its advice and in the information it gave the annuitant. But this did not mean the defendant was required to go beyond the request of the annuitant for information, to inject matters not raised by the annuitant, or to make independent inquiries into such extraneous matters, especially when these matters were well within the knowledge of the annuitant herself. Specifically, when the annuitant asked the difference in values between "guaranteed" and "unguaranteed" methods of settlement, the defendant was under no obligation to make an independent investigation of the annuitant's health in providing an answer to such inquiry. The defendant answered the inquiries of the annuitant fairly and truthfully; it gave the differences in value between the two forms of settlement. That was the extent of its obligation. The defendant had a right to assume that the annuitant herself knew the state of her health; the record shows that the assumption was well founded. She neither sought information with respect to her physical condition from the defendant nor relied on any advice of the defendant in that respect.

■ Even if it be assumed that there was any duty on the defendant to investigate the annuitant's health, what information would have been secured by the defendant that the annuitant did not already have? The defendant could only have repeated to her the information already given her by Dr. Levi. The choice of settlements made by her was not made by her out of ignorance or misap-

face of the defendant's policy created some affirmative obligation on the part of the defendant to advise and counsel the plaintiff and that such advice and counsel involved an investigation of all of her circumstances, including her health, and that if such obligation had been fulfilled and such investigation had been made, the company, in good faith, would have been obligated to have advised her not to execute a new annuity contract because that's what it amounted to. So, the question, as I view it, narrows down to that. Have I stated the plaintiff's position?

"MR. WITTENBERG: Eminently.

"THE COURT: Very well."

3. The defendant has cited a number of authorities to the effect that such language set out on the outside of the policy, constitutes no part of the policy or contract.

prehension of her health. She knew fully the details of her cancer operation. See, American State Bank of Bloomington v. National Life Ins. Co. (1938) 297 Ill.App. 137, 17 N.E.2d 256, 259–260.[4] Under such circumstance, when the annuitant filed her choice of settlement, it was the duty of the defendant to accept the choice.

The argument of the plaintiffs is very similar to that made in Tabachinsky, v. Guardian Life Ins. Co. (1956) Sup., 147 N.Y.S.2d 719. There, the executors sought to set aside an annuity contract, on the ground that, because of the annuitant's bad health, it was or should have been obvious to the defendant that the annuitant would not reach anywhere near her expectancy and that accordingly there had been a breach of a fiduciary relationship and an unjust enrichment of the defendant. The amounts involved were considerably more than those here and the disparity between costs of the annuity and actual benefits received by annuitant before her death comparable to that in this case. The Court dismissed the contention that the insurance company owed any duty to investigate the health of the annuitant with this observation from Rishel v. Pacific Mutual Life Insurance Co., *supra*, 78 F.2d. at page 888:

"But in annuities, the annuitant is the one who is interested in knowing that his health is normal before entering into the contract; he knows or can ascertain the state of his own health, and there is no reason why an insurance company should require him to ascertain the condition of his own health before contracting with him."

In the *Rishel Case,* which involved an attack on an annuity similar to that presented herein, the Court denied the executor's action to recover, saying, (pp. 887–888):

"An annuity contract cannot be avoided because the annuitant dies before attaining his average expectancy, or because it develops that his health was so impaired when the contract was written that his expectancy was less than the average. Annuity contracts could not be written by financially responsible companies if a recovery of the premium pro tanto could be had upon proof after death of some impairment of the organs when the contracts were written.

\* \* \* \* \* \*

"Plaintiff's case comes down to the points that an insurance company bears a fiduciary relationship to applicants for contracts, (of annuity) and that a company must inquire, at its peril, into the health of an applicant for an annuity. We are not in accord with that view of the law and are cited to no authority so holding. On the whole case, therefore, we see no reason for overturning these contracts, fairly made, because Mrs. Tew (the annuitant) unfortunately died before she expected."

It is suggested by the plaintiffs that the defendant knew or was put on notice of the condition of the annuitant's health and that this circumstance burdened the defendant with the duty to inquire fully into such condition and fairly and fully to advise the annuitant of it before exercising her choice of option settlements. The only basis for this contention is the statement in the annuitant's letter of November 21, where, in explaining her delay in writing the defendant, she wrote that she had been "hospitalized". She did not indicate why she was hospital-

4. In this case, which was decided on the pleadings, the Court pointedly observed that the plaintiff had failed to allege "that the defendant had any knowledge of her physical condition which she \* \* \* (the annuitant) did not or could not have had if she had so desired." (p. 263). Such failure was regarded as fatal to plaintiff's right to rescind. In the present case, as I have pointed out, the defendant not only did not have any information with reference to the annuitant's health but, if it had fully investigated the annuitant's health, it would have had no more information than the annuitant herself already had.

ized; nor did she intimate that she had not fully recovered. She was an intelligent woman in full possession of her faculties, as her letters abundantly demonstrated. The defendant had a right to assume she knew—as she admittedly did—what her physical condition was and the nature and character of the operation occasioning her hospitalization. It was under no duty to investigate such hospitalization. It had both a right and a duty to accept the election made by the annuitant[5] and it does not lie within the province of her legal representatives now to invalidate a choice she herself made, with full knowledge of her condition and without any coercion or inducement on the part of the defendant.

■ It is true that the defendant has profited from this settlement and that the annuitant's estate would have been better off had she exercised one of the other optional settlements available to her. This is not unusual in connection with annuity contracts.[6] If insurance companies never profited from an annuity contract, how could it afford to pay those whose lives exceeded the averages upon which their rates were based? The mere fact that an annuitant dies before

reaching her expectancy can no more void the annuity than the opposite situation where the annuitant lives beyond the expectancy. Both are within the contemplation of the parties. See, Carroll v. Equitable Life Assur. Society (D.C.Mo., 1934) 9 F.Supp. 223, 224.[7] Similarly, it is not for this Court to "second-guess" the testatrix. She apparently had her own reasons for the choice she made. She clearly knew what "unguaranteed" meant when she made her choice. The difference in monthly income between the guaranteed payment and the unguaranteed was not much but she deemed it sufficient to justify her choice and it is not for me or for the executors to decide contrariwise. She was apparently without blood relatives and it may have been her wish under such circumstances to obtain the largest possible safe income, without any responsibility of investment, for her lifetime. Whatever her wish, she was entitled to her own choice and it is my duty to respect that choice.

Sympathetic as I may be with the plaintiffs, I am of opinion that the motion of the defendant should be granted.

It is accordingly ordered that the motion of the defendant to set aside the

---

5. Cf., Fox v. Northwestern Mutual Life Ins. Co. (D.C.Idaho 1956) 136 F.Supp. 766, 768: "The insured was not obligated to exercise any of the options contained in said policy, but elected to do so. It must be kept in mind that it was his option, and not an option to be exercised on the part of the insurance company."

6. Many instances may be cited to illustrate this. Thus in Davis v. Equitable Life Assur. Society (1939) 280 N.Y. 656, 20 N.E.2d 1017, the annuitant purchased a life annuity at a cost of $10,000. Before receiving a single payment under the annuity and five months after its issuance, the plaintiff died as a result of cancer. Rescission was denied. In Woodworth v. Conn. Mutual Life Ins. Co. (D.C.N.Y. 1939) 27 F.Supp. 732, the annuitant received annuity payments of $1,185.75 before his death. He had paid a premium of $25,000 for his annuity contract. Rescission was sought on ground that the annuitant was ignorant of his serious physical condition and that consequently the defendant had been unjustly enriched. Rescission was denied. As the Court said

in Aldrich v. Travelers Ins. Co. (1944) 317 Mass. 86, 56 N.E.2d 888, 889:
"It is difficult to see how any company could carry on an annuity business if the estate of the annuitant could rescind whenever it turned out that the condition of his health did not 'warrant a reasonable expectation of life.'"
See, also, Fox v. Northeastern Mutual Ins. Co., supra, 136 F.Supp., at p. 769:
"'In the absence of fraud, mere inadequacy of consideration does not affect the validity of an annuity contract as such.'"

7. In this case, the Court, in describing the annuity contract involved therein, said:
"Both of them (the company and the annuitant) made an investment. The company looked for its profits arising from the early demise of the annuitant. The annuitant looked for her profits in a long life and one that would extend beyond her 'expectancy'. The contract was beneficial to both parties. The company made the greater profit because of the early death of the annuitant."

verdict and the judgment entered thereon for the plaintiffs, and for judgment for the defendant notwithstanding the verdict in accordance with defendant's motion for directed verdict is granted, and judgment for the defendant may be entered accordingly.