CHARLES CRIST DELMONICO, administrator of the estate of Josephine Crist Delmonico, deceased, complainant,

*v.*

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, defendant.

[Decided May 10th, 1934.]

*Mr. Thomas Brunetto* and *Mr. Charles Jones,* for the complainant.

*Messrs. Lindabury, Depue & Faulks (Messrs. Stryker & Meiers),* for the defendant.

BACKES, V. C.

Josephine Crist Delmonico, sixty-four years old, maiden, alone in life, with but $66,000 of her fortune left, her income insufficient for her wants, and fearful of her future security, paid the Prudential Life Insurance Company the $66,000 and insured to herself $500 a month for the rest of her life. She suicided a year later. Children of her deceased brother, Lorenzo, who never concerned themselves about her, nor she about them, two years after her death filed this bill through her administrator to recover the $66,000, charging that she was incompetent to make the annuity contract. Incompetence is the sole issue and the burden of proof is upon the complainant.

Miss Delmonico and her two brothers were raised by their uncle, Charles, and his sister, Rosa, proprietors of "Delmonico's," a famous New York restaurant. Upon the death of Charles, the sister came into ownership, and by her will Miss Delmonico acquired four-fifths and her brother, Lorenzo, one-fifth of the business. The other brother, Charles, was dead. There was disagreement, Lorenzo litigated and Miss Delmonico bought his interest for $165,000; the breach between them was never healed. Prohibition came and Delmonico's failed. Miss Delmonico had a small private estate upon which she depended after she lost the restaurant. She was a woman of education and refinement, but not of business. She had no cares while her uncle and aunt were living, and few while in affluence after their death. She was of a nervous type, and the litigation with her brother and the loss of Delmonico's brought on worries. For seven or eight years, until the summer of 1928, she lived a solitary life in an apartment in Brooklyn. Ailing, she consulted Dr. Holland, a stomach specialist, who treated her from August, 1927, until the following June, and because of her highly nervous and apprehensive state he recommended Dr. Hunt, a noted nerve specialist. Upon his or some other doctor's advice, she entered Stamford Hall, a sanitarium at Stamford, Connecticut, in August, 1928, where she remained eight days. Upon the suggestion of Mrs. Byles, a distant cousin and close friend, who felt Dr. Finnerty, an osteopath, could help her, she went to his institution, "The House of Finnerty," in Montclair, September 11th, 1928, and stayed twenty-one days, when she left for the Pines, a boarding house in Montclair, where she continued from October 2d to November 17th, 1928, under the care of Dr. Finnerty. Then, for a month and more, until December 20th, she was in Dr. Prout's sanitarium at Summit, from whence she returned to New York, first to Mrs. Byles for a few days and then to an apartment until May 12th, 1929, when she went to St. Vincent's Retreat, a sanitarium, until June 28th, and from there to a cottage at Mount Kisco, run by a nurse, where she leaped from a window and died the next day, September 17th, 1929.

Mrs. Wilmurt, the widow of Miss Delmonico's brother, Charles, was her intimate and adviser for many years, upon whom she depended. She accompanied her to Stamford Hall and took her away, to Dr. Finnerty's, and took her from there to the Pines and to Dr. Prout's, and when Mrs. Wilmurt moved to California in early December, 1928, Mrs. Byles took over the care of the sick woman; she had no one but these two devoted friends to look after her. Before she entered Stamford Hall, she gave Mrs. Wilmurt power of attorney of her bank account, and when Mrs. Wilmurt left for the west, Mrs. Byles took over the task. Both knew her cramped financial condition; it was the cause of great worriment to the three, for suitable institutions like Stamford Hall, Dr. Finnerty's and Dr. Prout's were expensive, far beyond her income, even exceeding the annuity.

The lay witnesses, all of whom came in close contact with Miss Delmonico, testify to her rationality. The medical testimony—the opinions of physicians in attendance upon her during her illness, and of others, all eminently qualified and worthy of respect, but partisanly divided—is in conflict; none says she was bereft, insane, when they observed her.

Miss Delmonico's affliction was psycho-neurosis, the prominent manifestations of which were extreme nervousness, phobias (fears) and consequent depression; arterio sclerosis (hardening of the arteries) was in progress. Her engrossing dread was of being closeted. The fear was of all manner of closures—rooms, automobiles, trains, wherever she might be shut in; claustrophobia appears to have imbedded itself at the age of sixteen, when she suffered a shock from being accidentally shut in a closet by a little boy who ran off and forgot her. She feared crowds and shunned them, and shrunk from being observed. When her fortune dwindled she feared for her financial security and expressed her apprehensions to Dr. Holland and her anxiety over how to manage on what she had left. At Stamford Hall she was highly nervous, distressed and unhappy, and well she might be, for her room opened on a corridor on which also opened fifteen other rooms occupied by mentally unstable patients; she took another

with a private nurse, but realizing that the change and a
private nurse meant an increase in charges which her income
could not meet, she telephoned Mrs. Wilmurt she could not
afford to stay, and left. At that time her income was about
$250 a month; the charges at the sanitarium, $125 a week.
The first intimation of mental disorder comes from Dr. Fin-
nerty: Miss Delmonico would report in the morning that
she was upset, prostrated, there were coffins in her room; she
refused to have her mouth X-rayed because the devil was on
two pivot teeth and she feared the X-ray would release him,
and that people were trying to kill her. To her nurse, she
regretted she was deteriorating and that her teeth were no
longer pretty; that devils were in her pivot teeth; she feared
she would die if she wore a certain dress, which had to be
slipped over the head, but that fear was overcome; she was
despondent, felt she had nothing to live for and wanted to
die, although afraid to go to sleep for fear of dying; she
mildly resisted everything and wanted to be let alone; had
to be urged to eat and to occupy herself according to institu-
tional regulations; went to movies against her will and at
the manicurist's had to be seated in a retired place. Dr. Fin-
nerty was of the opinion that she was incapable of judgment,
and that she had a false idea his institution was expensive
($598 for twenty-one days), yet he admits she left because
she announced her income would not allow her to stay, and
that she had to seek cheaper quarters.

Miss Delmonico's conduct at the Pines is of telling signifi-
cance; it was there that the annuity was negotiated. She
had no hallucinations. Aside from being highly nervous,
there was nothing abnormal in her deportment. She took
care of herself, attended to her personal needs, food and toilet,
dress and shelter; took her meals with the other guests in
the dining room, selected her food from the menus and was
pleased with it; took daily walks, sometimes stopping for
devotion at her church, conversed with her fellow boarders
and communicated with her friends over the telephone;
played Russian bank, and made boudoir dolls, presents for
her friends. She paid her current bills by check and sent

lists of them to Mrs. Wilmurt so she could check the bank account; she slept quietly at night. Worried over expenses and the inadequacy of her income and facing a financial crisis, upon the suggestion of a physician she took up the subject of annuity with her bankers, Mr. Mills and Mr. Parsons, who negotiated it with a New York agent of the Prudential Insurance Company. When the suggestion of the annuity came, and after communicating with her bankers, she broached the subject to Mrs. Wilmurt, who, quite as anxious, carried on, obtained the proposition, discussed it with Miss Delmonico, obtaining her decision, and arranged for the consummation. Mrs. Wilmurt brought the application for the annuity, and after Miss Delmonico read and signed it, and having previously arranged with Mrs. Wooton, the proprietress of the Pines, for a conveyance, the three went to the notary for an authentication. Obviously, Mrs. Wilmurt was keen for the solution of the dilemma, and perhaps urged it upon her beloved friend, to whom she was at once adviser, amanuensis, and messenger—but any insinuation of motive other than true devotion is painful unkindness. Miss Delmonico understood, and later expressed her gratitude and satisfaction to Mrs. Wilmurt, and her regret to Mrs. Byles because of the effect the parting with her estate for the annuity would have upon Mrs. Byles and her children, to whom she explained that she had to do it, she had to have the increased income the annuity brought.

Upon the annuity being assured, Miss Delmonico entered the sanitarium at Summit. She gave her history to Dr. Prout, and a full explanation of her fears, her depression and despondency. She was despondent because Mrs. Wilmurt was passing out of her life, and impressed him as unable to face the fact that she was no longer rich and could not afford what to her were the necessities of life; that there was nothing to live for. He says she knew the character of the institution and that she had to govern herself according to its regulations; understood she was there to be cured and tried to help herself; was submissive to the routine, had daily tonic baths, electric treatments and ultra violet rays; took

orderly care of herself in all respects, food, toilet, dress and sleep; drew checks and sent Mrs. Byles an account of them. She was highly nervous and besides her principal phobia, claustrophobia, fretted over her two pivot teeth and thought of pulling them out and seeing the points covered with blood; had a feeling there was something moving under her forehead like small teeth; was troubled over the thought of pitchers of blood standing about, and brooded over the thought of going insane. She left because she felt she could not afford the expense; it was in excess of her income. When about to leave, she was fearful her things would not be packed in time and feared the automobile trip to New York because she would have to be closed in (her fear of being in an apartment house with a strange man, "who might laugh at her or worse," is not explained).

After leaving Dr. Prout's, Miss Delmonico took up her home in an apartment in New York, having a housekeeper who was also her attendant. During her four and a half month's stay, there were no hallucinations. She took entire care of herself, took a daily bath and spent considerable time dressing her hair; sometimes she accompanied the housekeeper to market, selected the provisions and arranged the menus; occasionally she helped with the dishwashing and made her bed; she did a little reading, sewing, wrote letters, took walks, went shopping, taught the housekeeper how to play Russian bank, entertained callers and called up her friends on a dial telephone to tell them of her aches and pains; uncommunicative at times, she was voluble at others. Always highly nervous, she was happy at times, depressed at others, but entirely rational, according to the housekeeper. Two physicians, one who attended her three times, the other thirteen, in this period, found her nervous, but free of hallucinations or delusions.

During the month and a half at St. Vincent's Retreat, Miss Delmonico had no hallucinations but was in a highly nervous state, fearful and apprehensive. The only unusual thing, as indicated by the records of the institution, but not verified, was that she feared the food and medicine were poisoned. She left there unimproved.

At the cottage at Mount Kisco, from June 28th until her death, her life was very much the same as at the Pines and in her apartment. She stayed abed until noon, had her lunch and dinner downstairs, took walks, dressed herself, took care of her wardrobe, listened to the radio, talked about her travels, expressed preference for some foods, ate well and slept fairly well. Miss Gilleran, nurse in charge of the place, observed no hallucinations. A few days before her death she told Dr. Kennedy, her physician, she thought her food was poisoned and that she was seeing things entering and leaving her room; she did not specify what she saw. On the evening of September 17th, she went to her room alone and later was found by the nurse on the ground beneath her window. She explained to her that she was sitting on the sill and accidentally fell out, but to the doctor she admitted she had jumped out and was sorry she had not killed herself.

As to the medical testimony: If we could be assured that the opposing medical groups of psychiatrists had a common understanding of the facts, the value of their opinions as to the subject's mental capacity could be better judged by the reasons they assign for their views. The claim of incompetency is supported by the psychiatrists of the three institutions in which Miss Delmonico was treated; their opinions, which range from faulty judgment to insanity, were influenced by her personal history and especially by her institutional behavior during periods of her greatest excitement, when her phobias and apprehensions were apparently intensified by institutional restraint—sense of closure. Drs. Ranney and Robertson of Stamford Hall, who saw her three months before the signing of the contract, when, as they say, she was very nervous, depressed and fearful, assuming that her condition grew progressively worse after she left, were of the opinion that when the contract was signed she was incompetent, the latter going so far as to say she was insane. Dr. O'Neil of St. Vincent's Retreat, where her condition six months after the making of the contract was much as it was at Stamford Hall, assuming that her condition had grown

progressively worse since the making of the contract, was of the opinion that she had a faulty mentality. He was also of the view that the majority of psycho-neurotics are not incompetent and that Miss Delmonico was not mentally defective, that her ailment was slowly progressing with intermissions during which she might have been comparatively well, but that when he saw her she had a mental condition which made her unable to exercise a good discretion. Dr. Donahue, a specialist in nervous disorders, in answer to an imperfect hypothetical question, gave as his opinion that Miss Delmonico was incompetent. Dr. Prout, who saw her shortly after the annuity was effected, says of Miss Delmonico, that when she entered the institution she was mildly depressed; was properly oriented, as to time, place and circumstances and knew what she was talking about; that she was not normal, in the sense that she had fears; that her fears controlled her judgment in respect of things she feared and as to unrelated matters it affected her judgment secondarily. He admitted that her fear for her future security was entirely rational; that given an ordinary contract to read, she would understand the contents; that she had capacity to determine that she had the moral right to spend her money on herself or preserve it for others and sufficient understanding to know if she paid her money to an insurance company for an annuity it was gone and in place she would have the annuity, but he was, nevertheless, of the opinion that as her fear for her future security, which she realized was in jeopardy, prompted the annuity, that fear would be so intensified as to affect her judgment and in consequence he felt her judgment concerning the annuity would be very faulty. Dr. Hunt, who had observed and advised with Miss Delmonico before she entered Stamford Hall, and Dr. Beling, a nerve specialist, upon a recital of all the salient facts, conclude that she was capable of understanding the contract and knew what she was doing.

The case then comes to this: Miss Delmonico suffered from "nerves;" the affliction was chronic, affecting her men-

tal health. The manifestation was fear, the predominant fear, claustrophobia; others, latent, were spasmodic, occasional; the fears had a common origin and were kindred, their multiplication and intensity finding their peak in institutional confinement. When out, she led the normal life of a nervous invalid. The multiform hallucinations experienced in the institutions were fancies of an intensified mental disturbance, superficial, transitory and gone when freedom was regained and calm restored. As to the nature of the hallucinations there is no disagreement with Dr. Hunt's interpretation that they were vivid sensory perceptions or impressions and not delusions—fixed false ideas, nor with his view that Miss Delmonico's depression was situational, aggravated by corridor life, and demonstrated by its profoundness while she was in institutions, and its comparative absence in more natural and quieting surroundings at the Pines, her apartment and the Mount Kisco cottage. (Hospitalization is to build up physical resistance to encroachment upon the nervous system; while the nervous strain is increased during the process, the patient leaves more bodily fit; and, the tension removed, there is renewed spirit, the anxiety is diminshed and fears allayed.) After hospital treatment, Miss Delmonico responded in betterment of composure and with her master phobias subdued. Six letters, well couched, well written, of things current and of concern to both, written by Miss Delmonico to Mrs. Wilmurt, while at ease at the Pines, testify to her normality, her intelligence and comprehension. The lay witnesses give assurances of her sensibleness at that time. The psychiatrists who hold Miss Delmonico incompetent at the making of the contract believe that her fears controlled her judgment to the point of general incompetency, that her phobias, especially her fears in respect of her future security, were intensified to a state of irrational apprehension, and in consequence she lacked capacity to contract the perfectly sensible annuity contract. Equally eminent in the science are the physicians who are of the opinion that she was competent, and their views more nearly accord with the estab-

lished facts, that when the annuity was under consideration, her fear for her future financial security was real; the safeguard she adopted was rational, the annuity was knowingly arranged and understandingly executed, and when accomplished, apprehension vanished and contentment took its place; grateful for the solution of the embarrassing problem, she had a single regret—her friend, Mrs. Byles, would suffer.

Proof of incompetency is not established. The bill will be dismissed.