**RISHEL v. PACIFIC MUT. LIFE INS. CO. OF CALIFORNIA, and five other cases.**

**Nos. 1217–1222.**

Circuit Court of Appeals, Tenth Circuit.
Sept. 5, 1935.

882

Harold D. Roberts, of Denver, Colo. (James H. Ball, Burton W. Musser, and Thomas L. Mitchell, all of Salt Lake City, Utah, and Peter H. Holme and Milton J. Keegan, both of Denver, Colo., on the brief), for appellant.

Cass M. Herrington, of Denver, Colo., for appellee Pacific Mut. Life Ins. Co. of California.

Norman A. Hutchinson, of Denver, Colo. (Pershing, Nye, Bosworth & Dick, of Denver, Colo., on the brief), for appellee Penn Mut. Life Ins. Co. of Philadelphia.

Percy A. Robinson and Carl C. Hearnsberger, both of Denver, Colo., for appellee Equitable Life Assur. Soc. of United States.

Horace Phelps, of Denver, Colo. (James D. Benedict and Horace F. Phelps, both of Denver, Colo., on the brief), for appellee Prudential Ins. Co. of America.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

These are actions at law to recover the sums paid by way of single premiums for six annuity contracts. Plaintiff declares generally upon the common counts of moneys had and received for the use and benefit of his testate, but does not stop there. Instead, plaintiff sets out the annuity contracts granted for the sums paid, with other facts thought to justify

rescission of the contracts and the recoveries prayed for notwithstanding, thereby anticipating the defense and alleging facts in avoidance thereof. The general allegations of the common counts are controlled and limited by the specific allegations on the same subject matter. United States v. Union Pac. R. Co. (C. C. A. 8) 169 F. 65, 67; Patrick v. Colorado Smelting Co., 20 Colo. 268, 38 P. 236, 238. Defendants severally demurred; the trial court sustained the demurrers and the plaintiff electing not to plead further, judgments were entered for the defendants. We take the cases as they were presented below and here, and determine whether on the whole case as alleged, causes of action are stated. While an action on the common count is legal in form, it is for money which, ex aequo et bono, the defendant ought to refund, and is governed by equitable considerations. Moses v. Macferlan, 2 Burr. 1005, per Mansfield, C. J.; United States v. Jefferson Electric Co., 291 U. S. 386, 402, 54 S. Ct. 443, 78 L. Ed. 859; Sanford v. First Nat. Bank (C. C. A. 8) 238 F. 298, 301; Howbert v. Norris (C. C. A. 10) 72 F.(2d) 753.

■■ 1. For the moneys received, the defendants issued their several contracts agreeing to pay sums certain at fixed intervals during the lifetime of Mrs. Tew. Annuity contracts are valid on their face, Greevy, Adm'r, v. Massachusetts Mutual Life Ins. Co. (Neb.) 259 N. W. 656, and have been recognized and enforced by the courts for more than a century. The Colorado statute expressly authorizes insurance companies to grant annuities. Colo. L. 1921, § 2500.

2. They are not wagering contracts except in the rough sense that insurance is a wager. If a house burns down the day after a fire policy is issued thereon, the insured receives more than he has paid; yet he has not wagered; he has simply shared his risk with others. An annuitant, for a sum certain, shares the risk of outliving his expectancy with others, as well as distributing the risk of losing his capital by diversification of investment made possible by pooling his capital with others. In a sense, if he lives longer than the average of his age, he wins; not so long, he loses; but in the broader and truer sense, he has substituted certainty for uncertainty, which is the function of insurance. In any event, courts may not declare illegal a contract specifically authorized by the legislature of Colorado.

■ 3. Nor were the contracts impossible of performance when made. An annuity contract is not rendered impossible of performance because the annuitant, alive when the contract was made, is killed or dies before payments are due thereon. Three of the contracts expressly contemplate such contingency by providing for the first payment only if the annuitant "be then living"; it is implied in all by the agreement to pay "during the lifetime of the annuitant." Aside from these provisions, the contracts must be read in the light of the knowledge of all mankind, that death may come tomorrow. One who positively agrees to perform a lawful act is not absolved from liability because of a subsequent impossibility of performance. Day v. United States, 245 U. S. 159, 38 S. Ct. 57, 62 L. Ed. 219; Jacksonville, etc., Ry. Co. v. Hooper, 160 U. S. 514, 527, 16 S. Ct. 379, 40 L. Ed. 515; Berg v. Erickson (C. C. A. 8) 234 F. 817, 820, per Sanborn J.; Summers v. Midland Co., 167 Minn. 453, 456, 209 N. W. 323, 46 A. L. R. 816; Coyne, Adm'r v. Pacific Mutual Life Insurance Co. (Cal. App.) 47 P.(2d) 1079 (where annuitant died before any payments made); Restatement, Contracts, c. 14.

■ 4. Section 2520, Colo. L. 1921, provides that "no policy of insurance" shall be delivered until the form of the same has been filed with the Commissioner of Insurance, and authorizes a suspension of the certificate of authority of any company violating such provision. In five of the cases, it is averred that the forms of the annuity contracts were not so filed, from which plaintiff concludes the contracts are void. We disagree. It is very doubtful whether annuity contracts are insurance policies within the meaning of this section. Respectable courts have held they were not. Hall v. Metropolitan Life Ins. Co., 146 Or. 32, 28 P.(2d) 875, where the contention made here was denied; Carroll v. Equitable Life Assur. Soc. (D. C.) 9 F. Supp. 223; People v. Knapp, 193 App. Div. 413, 184 N. Y. S. 345, affirmed 231 N. Y. 630, 132 N. E. 916; Commonwealth v. Metropolitan Life Ins. Co., 254 Pa. 510, 98 A. 1072. Until the Colorado Supreme Court so rules, we are not prepared to hold that an annuity con-

tract is an insurance policy as used in this statute. In many respects it is the exact converse, and in common parlance the word insurance does not embrace annuities. There is an even stronger reason. The statute does not purport to void insurance policies which have been issued without complying with the statute, and such drastic remedy is not lightly to be implied. The statute specifically providing one penalty, it would be pure legislation for the courts to superimpose thereon the additional penalty of avoidance of the policies. It was so held in Walters v. Western Automobile Ins. Co., 116 Kan. 404, 226 P. 746; Southern Casualty Co. v. Hughes, 33 Ariz. 206, 263 P. 584. See, too, Couch on Insurance § 151.

5. For the moneys had and received by defendants, plaintiff's testate accepted these contracts. Unless the facts surrounding their execution are such as to justify equity in declining to recognize them, no cause of action is stated.

█ Annuity contracts, like other contracts, may be avoided if the annuitant is of unsound mind, or if they are procured by duress or through fraud or misrepresentation of material facts. If there is a fiduciary relationship between the contracting parties, a strong and affirmative burden rests upon the fiduciary to show beyond a reasonable doubt that the contract made was as favorable to his cestui as could have been made. Inadequacy of consideration is evidence of mental incapacity, duress, or fraud; if the consideration is so grossly inadequate as to repel the conscience of the Chancellor, equity may refuse its aid in enforcement. Restatement, Contracts § 367.[1]

█ Although the proof may be insufficient to support any specific ground of attack, if it stood alone, equity may decline to enforce a contract if all of the evidence leads to the conclusion that there was an imposition or overreaching in its procurement. In Allore v. Jewell, 94 U. S. 506, 510, 24 L. Ed. 260, an aged and bedfast woman, of feeble intellect, living in degradation, conveyed her property to a business man who knew her condition for a pitifully inadequate annuity. The transfer was set aside, the court saying:

"It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane, or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that, from her sickness and infirmities, she was at the time in a condition of great mental

---

[1] It is frequently stated that inadequacy of consideration, standing alone, is not sufficient ground for avoiding a contract. Inadequacy will not support the defense of lack of consideration. But inadequacy so gross as to shock the conscience of the court may make the conclusion inevitable that either fraud, mistake, duress, or mental incompetency, attended the inception of a contract. In Hume v. United States, 132 U. S. 406, 414, 10 S. Ct. 134, 137, 33 L. Ed. 393, plaintiff accepted a proposal to sell shucks to the government for 60 cents a pound when the market price was about that price per hundredweight. Although the action was at law, the court refused to let plaintiff profit by this obvious error, and in that connection said:

"And there may be contracts so extortionate and unconscionable on their face as to raise the presumption of fraud in their inception, or at least to require but slight additional evidence to justify such presumption. In such cases the natural and irresistible inference of fraud is as efficacious to maintain the defense at law as to sustain an application for affirmative relief in equity."

Mr. Williston, in his work on Contracts, § 1428, says:

"It is generally said that the inadequacy of consideration standing alone must be so extreme as to afford evidence of fraud, or it will be no bar to specific performance. * * * There are always many surrounding circumstances, and it is certainly true that inadequacy of consideration in connection with other facts which of themselves would not bar relief may justify a refusal to enforce a contract."

In the Restatement of Contracts, § 497, p. 955, it is said:

"Inadequacy of consideration or any other disadvantageous feature in an agreement is important as evidence in connection with other circumstances showing unfair persuasion, but is not in itself enough to establish undue influence."

While the courts are not the guardians of the business judgment of contracting parties, the consideration of a contract may be so grossly inadequate that courts will not recognize it as a binding obligation.

weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances, imposition or undue influence will be inferred."

The diligence of counsel has brought to our attention numerous cases dealing with annuity contracts.[2] In Holman v. Loynes, D. G. M. & G. 4, page 270, an attorney granted an annuity to his client, computed on a good life; his client was in rapidly failing health, as the attorney well knew. The contract was set aside, the attorney failing affirmatively to show that no industry on his part could have secured a better bargain for his client. The same conclusion was reached in Davies v. Cooper, 41 Eng. Rep. 373, where the defendant granted an annuity to his brother-in-law whom he knew to be a dying dipsomaniac "in the last stages of debility and disease, with no chance of recovery or of living many months." In Gibson v. Jeyes (1801) Ves. Ch. 6, page 266, an attorney granted an annuity of 50 pounds a year to his client, an aged woman on the border line of imbecility; he could have procured for her an annuity of 60 pounds for the same consideration. In Green v. Roworth, 113 N. Y. 462, 21 N. E. 165, two sons procured from their father, old and feeble in mind, a conveyance of his property for a totally inadequate consideration. In Barnes v. Waterman, 54 Misc. 392, 104 N. Y. S. 685, an annuity granted by a confidential adviser was procured by undue influence with fraudulent intent. These contracts likewise were avoided. In each of these cases, a fiduciary relationship existed. In Clarkson v. Hanway, 24 Eng. Rep. 700, an aged man, easily imposed upon, conveyed an inheritance of 40 pounds per annum for an unsecured annuity of 20 pounds per annum; in Gwynne v. Heaton, 28 Eng. Rep. 949, a man 81 years of age purchased an annuity computed on an expectancy of 17 years; in Heathcote v. Paignon (1787) 29 Eng. Rep. 96, an annuity which should have cost at least 500 pounds was purchased for 200 pounds. All of these were set aside, the compelling reason in each case being the grossly inadequate consideration, determined by reference to standard mortality tables.[3]

Annuity contracts issued for a consideration computed on the expectancy of the annuitant as disclosed by standard mortality tables have been sustained in the following cases: Delmonico v. Prudential Insurance Co., 172 A. 597, 12 N. J. Misc. 448 (a spinster 64 years of age, afflicted with many delusions and an inmate of numerous sanitariums); Richardson v. Travelers' Insurance Co., 109 Me. 117, 82 A. 1005 (a man 78 years old, afflicted with senile dementia, who died before the first payment was made; the court found he had sufficient mental power to comprehend as simple a transaction as an annuity contract, and that it was written on the same terms offered others of his age); Hult v. Home Life Insurance Co., 213 Iowa, 890, 240 N. W. 218 (a woman 72 years old, queer in many ways, bought seven contracts over a period of three years, and died before any payments were made on two of them; the court found no fiduciary relationship between her and the insurance agent); Coyne v. Pacific Mutual Life Insurance Co. (Cal. App.) 47 P.(2d) 1079 (a man 60 years old, who died before the first payment was made, and whose mental capacity was challenged).

Although not in itself determinative, it is worthy of note that in each of the American cases the contract was based on published tables of average lives, while that was not so in the English cases cited. The consideration of annuity contracts written on standard mortality tables is prima facie adequate and fair.

---

[2] Counsel for appellant have quoted liberally from certain cases, properly noting elisions by asterisks. But the parts of sentences elided, in at least four instances, greatly impaired the force of the parts quoted. This is mistaken zeal which, while doing no particular harm, is not to be commended.

[3] We do not see the application of the other two cases relied upon by appellant. In Kennedy v. Thommassen, 1 Ch. Div. L. R. 426, an annuitant died pending negotiations to commute the annuity; a contract concluded after her death and in ignorance of it was set aside, her death having terminated the authority of her agent to execute the contract. In Alexander v. Equitable Life Assurance Society, 233 N. Y. 300, 135 N. E. 509, the defendant, acting through its officers, granted large annuities to their own wives in consideration of work done and to be done not compensated for by their salaries. The contracts were, of course, avoided for reasons with which we are not now concerned.

We have examined these cases and others in order to determine, if possible, whether there is a conflict in the authorities, and more particularly between the English and American courts. We conclude there is no such conflict; excerpts from the various opinions, even without elisions, may be culled out which apparently clash, but considering the informality of the English opinions and reading them and those from our courts against the background of the facts, we see nothing to suggest a departure from the ordinary rules followed by our courts of equity when requested to avoid a contract, and stated at the beginning of this numbered paragraph.

■■■■ 6. There remains the task of ascertaining whether facts are pleaded which justify an avoidance of the contracts under these applicable equitable considerations. The amended complaints contain much argument, many computations, and bristle with conclusions of law and fact. The demurrers admit the facts well pleaded, but do not admit conclusions of law or conclusions of fact unsupported by allegations of the specific facts upon which the conclusions rest. Spielman Motor Sales Co. v. Dodge, 295 U. S. 89, 55 S. Ct. 678, 79 L. Ed. ——; Public Service Commission v. Great Northern Utilities Co., 289 U. S. 130, 53 S. Ct. 546, 77 L. Ed. 1080; Beaumont, S. L. & W. R. Co. v. United States, 282 U. S. 74, 51 S. Ct. 1, 75 L. Ed. 221; Ætna Insurance Co. v. Hyde, 275 U. S. 440, 48 S. Ct. 174, 72 L. Ed. 357; St. Louis, etc., Railroad v. United States, 267 U. S. 346, 45 S. Ct. 245, 69 L. Ed. 649; Pullman-Palace Car Co. v. Missouri Pacific R. Co., 115 U. S. 587, 6 S. Ct. 194, 29 L. Ed. 499; Pantages Theatre Co. v. Welch (C. C. A. 9) 71 F.(2d) 68; Bennett v. Ahrens (C. C. A. 7) 57 F.(2d) 948. General allegations that defendants' conduct was fraudulent, or that the contracts were procured by duress, or that a fiduciary relationship existed, etc., are not admitted by the demurrers. The question is, Do the facts alleged support such conclusions?

*Fiduciary Relationship.* If facts giving rise to a fiduciary relationship between the parties are alleged, then an affirmative burden is upon the defendants to prove that the contracts were fairly made and as favorable to Mrs. Tew as the fiduciaries could have procured for her in the market place.

■■■■ The facts alleged are that defendants bore a confidential and advisory relationship to Mrs. Tew, and that defendants were quasi-trustees, because they were insurance companies admitted to do business in Colorado. While insurance contracts are uberrimae fidei, Stipcich v. Metropolitan Insurance Co., 277 U. S. 311, 48 S. Ct. 512, 72 L. Ed. 895, an insurance agent does not stand in the relationship to his customer that a lawyer does to his client or a father to his son. Misrepresentations or concealments are not tolerated, but none such is even inferentially alleged. The law does not cast upon insurance companies the affirmative burden cast upon trustees who deal with the property of their cestuis.

■■■■ It is alleged that defendants had wide experience with annuity contracts and Mrs. Tew was inexperienced therewith. Mrs. Tew had carried one annuity for more than two years when the last five contracts were made, and unless she was totally devoid of mentality—not alleged and disclaimed in the briefs—she must have understood the very simple fact that for a given sum she was to receive another sum at stated periods during her life. But even so, the fact that a seller of horses or automobiles knows more about them than the buyer, does not make the seller a quasi-trustee for the buyer. If that were the law, there could be no arm's length bargaining except between those of identically the same knowledge and experience.

■■■■ It is generally alleged that the defendants persuaded and procured Mrs. Tew to purchase the contracts. But how? The persuasion and procurement may have been by telling her the whole and exact truth about the contracts; there is no allegation of any misstatement, and fraud and misrepresentation are never presumed.

*Mental Capacity and Duress.* It is alleged that Mrs. Tew was 63 years of age when five of the contracts were made, and 60 years of age when the first one was issued; that her mental faculties were greatly weakened, and that she was of weak and impaired mind. Neither in the briefs nor oral argument is it contended that this allegation, standing alone, is sufficient to support a finding that Mrs. Tew lacked the mental capacity to enter into a simple annuity contract. On the contrary, it is assumed that insanity was not pleaded as an independent ground of

relief, but that her impaired mentality was a circumstance to be considered in determining whether, taking a view of the entire case as was done in Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260, such over-reaching has been alleged as will avoid the contracts. There is no allegation as to duress except in such general terms as "persuaded" and "procured" heretofore discussed.

■ *Adequacy of Consideration.* The contracts were written on standard mortality tables. Standard annuity contracts are written on the theory that while the span of life of an individual is unknown, the average expectancy of a large group is known; the consideration is therefore based on the average life, and is that sum which, plus conservative compound interest (generally 3% or 4%) and less expenses, will equal the payments to be made during the expectancy of the annuitant. If the annuitant lives longer than that, he receives more than he paid in; if less, he receives less. The consideration here is that used by the English courts, in many of the cases above cited, as a standard of adequacy. The tables are doubtless built upon a study of "good" lives—those in normal health—for the companies must expect that one with enough mentality to contract would not purchase an annuity if he knew his tenure of life was short, and that the average person would consult his own physician before entering into such a contract. There can be no question here of adequacy of consideration unless it is because Mrs. Tew's health was poor when she purchased the annuities.

*The Health of the Annuitant.* It is alleged that Mrs. Tew was sixty years old past in July, 1928, when she applied for the first annuity; that she was of weak and impaired mind, inexperienced in business, in feeble health, suffering from dropsy, a weak heart, a diseased stomach and abdomen; that her illness was permanent and she had no reasonable chance to recover; that her expectancy was less than seven years, instead of fourteen years, the average expectancy at the attained age.

Two and a half years later she was still of weak and impaired mind, suffering from the same diseases and an anal ulcer, and expecting to undergo a major operation; her expectancy was less than six years instead of the average of twelve.

Whether she underwent that operation, or whether her death in 1931 was occasioned by any of such diseases or was the result of an accident, the complaints do not state. Nor is it alleged that the presence of such diseases could be detected by the unskilled on casual observation. Certainly her diseases were not imminently dangerous, for she lived three years while suffering from them, and it is alleged that even in 1931 she was expected to live many more years.

An annuity contract cannot be avoided because the annuitant dies before attaining his average expectancy, or because it develops that his health was so impaired when the contract was written that his expectancy was less than the average. Annuity contracts could not be written by financially responsible companies if a recovery of the premium pro tanto could be had upon proof after death of some impairment of the organs when the contracts were written.

■ Apparently agreeing, it is argued that defendants knew her diseased condition. We admit, at least arguendo, that if an insurance company grants an annuity on standard rates to one it knows is in seriously impaired health, the contract ought not to stand. But the complaints do not bear out the argument. The allegations are:

"Defendant at the time it received said $8,672.72 and at the time said writings Exhibits A and B were signed could have known the extent and nature and character of Elfie R. Tew's bad health, weak mental condition, and short life expectancy upon the smallest possible inquiry. Plaintiff is informed and believes and upon such information and belief alleges that defendant at said times had knowledge of Elfie R. Tew's bad health, weak mental condition, and short life expectancy, and of all the facts alleged in paragraphs numbered 5, 6, 7, 8 and 9 of this Amended Complaint; that defendant avoided making or having made any medical examination of Elfie R. Tew at or prior to the time defendant obtained said $8,-672.72 and prepared and delivered said writing Exhibit B to her; and that defendant avoided making or having made such medical examination because defendant knew and believed Elfie R. Tew was in poor health and had no reasonable chance of recovering from her illnesses and that she would soon die."

We construe this to allege that defendants are charged with knowledge from their failure to inquire, and particularly to require a medical examination. In plaintiff's brief, defendants are charged with "constructive knowledge" and authorities are cited as to the necessity for inquiry, two[4] where a lawyer granted an annuity to his client, and one[5] where the court said that actual knowledge might be found from the probabilities of inquiry under the facts of that case. The brief then proceeds:

"In the complaints here under consideration there are also allegations that defendants had actual knowledge of Mrs. Tew's condition and that defendants avoided making or having made any medical examination of Mrs. Tew because they knew and believed she was in poor health and had no reasonable chance of recovering from her illnesses and that she would soon die. Under the authorities discussed these allegations show matters of aggravation, but plaintiff does not have to prove that defendants had actual knowledge of Mrs. Tew's mental and physical illnesses to establish a case. It is enough if plaintiff proves that defendants might have known of Mrs. Tew's mental and physical illness and short life expectancy upon reasonable inquiry."

Plaintiff's contention comes to this, that an insurance company is bound to inquire, by medical examination or otherwise, into the health of an applicant for an annuity. Except where a fiduciary relationship exists, no statute or no case has been cited so holding. The argument is that since companies require a medical examination on most life insurance policies, they must require them on annuity contracts. But, as counsel say elsewhere in the brief, "annuities are the reverse of insurance." Where a life is insured, the company should know the state of the applicant's health, for if the sick are insured along with the well, the cost of insurance would be prohibitive; to ascertain that fact, recourse generally is had to medical examinations. But in annuities, the annuitant is the one who is interested in knowing that his health is normal before entering into the contract; he knows or can ascertain the state of his own health; and there is no reason why an insurance company should require him to ascertain the condition of his own health before contracting with him. If the annuitant, for his own protection, wants a medical examination before contracting, nothing prevents him having one. These contracts cannot be stricken down because defendants did not require Mrs. Tew to take examinations for her own protection. The argument is unsound, and the analogy breaks down, for another reason: A life insurance policy is valid even if written without a medical examination, as many of them are. A contract cannot be avoided because one or the other of the parties might have been better advised before signing.

■ *On the Whole Case.* Considered ensemble instead of separately, as was done in Allore v. Jewell, supra, do the complaints state a case justifying the interposition of equity? In 1928 Mrs. Tew, a widow suffering from ailments not uncommon among the elderly, paid $28,321.20 for an annuity contract, from which she received a regular income of $200 a month. Apparently she thought well of the idea, and in 1930 and 1931, she invested $65,000 more in similar contracts with the same and three other companies. Her reasons, we do not know. Perhaps she wanted a larger income than the returns available from safe investments; perhaps she wanted to escape the responsibility of investment. In any event, she entered into the contracts with nationally known companies on their regular rates. Whether she took the precaution to be physically examined, whether she took independent advice, we do not know. She died shortly thereafter, but the cause of her death is not related. No fraud, no misrepresentation, no duress, is charged. Plaintiff's case comes down to the points that an insurance company bears a fiduciary relationship to applicants for contracts, and that a company must inquire, at its peril, into the health of an applicant for an annuity. We are not in accord with that view of the law and are cited to no authority so holding. On the whole case, therefore, we see no reason for overturning these contracts, fairly made, because Mrs. Tew unfortunately died before she expected.

---

[4] Holman v. Loynes, D. G. M. & G. 4, page 270. Gibson v. Jeyes (1801) Ves. Ch. 6, p. 266.

[5] Allore v. Jewell, 94 U. S. 506, 510, 24 L. Ed. 260.

7. Motions to strike were sustained in part and error is assigned. We have considered those parts of the stricken matter which seem to advance plaintiff's cases, and the errors in the rulings, if any, do not require reversal.

The judgments are affirmed.