In re Mark Neil VINZANT, Elaine
Warszawski Vinzant, Debtors.

In re William B. SORENSON, Jr.,
Trustee, Plaintiff,

v.

TIRE HOLDINGS LIMITED
PARTNERSHIP and Triple
H–Tire, Inc., Defendants.

Bankruptcy No. 87–13024.
Adv. No. 88–0111.

United States Bankruptcy Court,
D. Kansas.

July 7, 1989.

Michael P. Waddell, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., for plaintiff/trustee.

Calvin L. Wiebe, Triplett, Woolf & Garretson, Wichita, Kan., for defendants.

## MEMORANDUM OF DECISION

JOHN K. PEARSON, Bankruptcy Judge.

The above captioned adversary comes before the Court upon the trustee's complaint for the recovery of preferential transfers. Plaintiff appears by Michael P. Waddell of Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita. Defendants appear by

Calvin L. Wiebe of Triplett, Woolf & Garretson, Wichita.

## NATURE OF THE CASE

The trustee filed this action to recover allegedly preferential transfers pursuant to 11 U.S.C. § 547(b). The trustee alleges that the defendants received the sum of $89,143.15 and received assignments of certain annuity contracts belonging to debtors within the ninety days preceding bankruptcy. The trustee alleges that these assignments and payments were preferential and fraudulent transfers within the meaning of 11 U.S.C. §§ 547(b) and 548(a)(2) respectively. The defendants deny that the transfers took place within the preference period.

## FINDINGS OF FACT

Based on the stipulations of the parties and the evidence presented, the Court makes the following findings:

1. This Chapter 7 petition in bankruptcy was filed on November 4, 1987.

2. William B. Sorenson, Jr. ("trustee") qualified and was appointed trustee in this Chapter 7 case.

3. On April 1, 1987, Mark Neil and Elaine Warszawski Vinzant ("debtors") signed guarantees on two certain promissory notes in the aggregate principal sum of $875,000.00. As a result, the debtors became contingently indebted to Tire Holdings Limited Partnership ("defendant").[1]

4. On June 12, 1987, defendant obtained a judgment against the debtors in the District Court of Douglas County, Nebraska in the amount of $900,376.82. The judgment was subsequently registered in Sedgwick County District Court on June 16, 1987 in Case No. 87-T-267.

5. On August 3, 1987, defendant and the debtors entered into a forbearance agreement ("Forbearance Agreement") regarding the indebtedness arising out of the guarantees executed by the debtors. In consideration for the release of the Sedg-

---

1. The defendants in this case, Tire Holdings Limited Partnership and Triple H–Tire, Inc. are related entities. Tire Holdings is an Arizona limited partnership. Triple H–Tire, Inc. is the sole and only general partner of Tire Holdings. The Court will refer to Tire Holdings in the singular, as "defendant."

wick County judgment, the debtors transferred to the defendant their interest in two annuity insurance contracts. At the time of the assignment the annuity insurance contracts each had a cash surrender value of $18,973.95 and an accumulated value of $24,348.09.

6. In addition to the transfer of the two annuity insurance contracts and, in further consideration of the release of the Sedgwick County judgment, debtors also paid the defendant the following amounts:

(a) On August 3, 1987, debtors issued defendant a check in the amount of $40,-000.00.

(b) On August 12, 1987, debtors issued a check to defendant in the amount of $45,000.00. The check was converted to a cashier's check on August 13, 1987.

(c) On August 12, 1987, debtors issued a check to defendant in the amount of $1,381.05.

(d) On September 11, 1987, debtors issued a check to defendant in the amount of $1,381.05.

(e) On October 9, 1987, debtors issued a check to defendant in the amount of $1,381.05.

(f) The total amount of cash transferred to defendant was $89,143.15.

7. On August 14, 1987, by stipulation, defendant received judgment of $326,-447.88 against various parties, including debtors, in Sedgwick County District Court, Case No. 87–C–573.

8. On August 26, 1987, defendant filed judgment lien waivers in Sedgwick County District Court in Case Nos. 87–T–267 and 87–C–573. The waivers released judgment liens arising out of the above referenced cases on:

(a) the debtors' undivided one-half interest in the following described real estate:

Lot 1, except beginning at the southwest corner, east 228.5' to the north line, west 218.5' to the northwest corner, south to beginning, Block E, Morningview Sixth Addition to Derby, Sedgwick County, Kansas,

(the "Derby Lot"); and

(b) the debtors' interest in the following described real estate:

Lot 29, Block A, Brook Forest East Addition to Derby, Sedgwick County, Kansas,

(the "Brook Forest Lot").

9. On August 13, 1987, the attorneys for defendant sent a letter to Jackson National Life Insurance Company ("Jackson") informing it of the collateral assignments of the debtors' interest in the annuity insurance policies. The letter enclosed the original collateral assignments. Jackson received the letter with the original collateral assignments on August 18, 1987. Jackson acknowledged the assignment to defendant by letter on September 10, 1987.

10. On August 17, 1987, a U.C.C. filing statement describing the annuity insurance contracts was filed with the Kansas Secretary of State listing Tire Holdings as the secured party and Mark and Elaine Vinzant as debtors.

11. The Brook Forest Lot was debtors' exempt homestead at all relevant times, including June 12, 1987, August 26, 1987 and the filing date.

12. The above referenced transactions resulted in defendant receiving, within ninety days prior to the filing date, payment of $49,143.15. Further, the transactions resulted in defendant's receiving collateral assignments of the debtors' interests in the annuity insurance contracts valued at $37,947.90.

13. The payment of $49,143.15 and the collateral assignments to the defendant were made while the debtors were presumed to be insolvent. Debtors make no effort to rebut the presumption. The Court, therefore, finds the debtors were insolvent.

14. The payment of $49,143.15 and the collateral assignments to the defendant were made to or for the benefit of the defendants.

15. The Forbearance Agreement between defendant, debtors and other obligors was in respect to and on account of an antecedent debt owed by the debtors and other obligors. The payment of $49,143.15 and the collateral assignments to the defen-

dant were in performance of the obligations under the Forbearance Agreement.

16. The appraiser for the trustee, Steven J. Martens, appraised the market value of the Derby Lot as of February 1989 at $82,000.00. The debtors own a one-half interest in the Derby Lot. The defendant's appraiser appraised the Derby Lot based upon a view of the property in August of 1987 at $143,000.00. The Court concludes that the debtors' one-half interest in the property was $71,500.00, one-half the appraised market value of the property by the defendant's appraiser, John R. Lawn.[2]

## CONCLUSIONS OF LAW

1. Assignments of annuity contracts are governed by the perfection requirements under the U.C.C.

2. The transfers by the debtors to the defendant took place within the ninety days preceding bankruptcy.

3. Because the debtors received a release of property, they received value for the payments.

**2.** The Court is somewhat troubled by the appraisals in this situation. While the Court finds that Mr. Martens' appraisal is more persuasive in its comparables, it was not made at the appropriate point in time. The appropriate time for the appraisal was either at the time of the filing of the petition in bankruptcy or at the time that the lien release was recorded. *Compare In re Frazier*, 33 B.R. 175 (Bankr.D.Md. 1983) (time of filing petition); with *In re George Rodman, Inc.*, 792 F.2d 125 (10th Cir.1986) (time of contemporaneous exchange). In this case the difference was relatively small between those two dates and, therefore, probably would not make a material difference in the valuation of the property. However, Mr. Martens testified to the value of the property as of February 1989, when he actually viewed it. This simply is not close enough in time to the transfers at issue. For example, assuming that the liens have been released on a depreciating item of personal property, the trustee certainly could not measure the value of the preference by appraising the property as of the time of trial on the preferential transfer. Rather, the preference would be measured by the value of the property released to the debtors at the time of the allegedly preferential transfer.

The Court also has substantial difficulty with the theory that the appraisal should be based on a market value. *See, e.g., Matter of Clark Pipe &*

4. The transfers to the defendants are preferential to the extent that the value of the annuities and cash payments exceed the value of the debtors' interest in the Derby Lot.

5. The transfers were not fraudulent, however.

## DISCUSSION

### I. The Annuity Contract is Subject to the U.C.C.

The first issue to be addressed is whether the debtors' assignment of their interests or claim in the annuity contracts are governed under the U.C.C. K.S.A. 84–9–104(g). Whether the debtors' assignments are covered under the U.C.C. affects the manner and ultimately the date that the defendants perfected their interests in the annuity insurance contracts. The trustee contends that the U.C.C. governs the perfection of the defendants' interest in the annuity insurance contracts. By arguing that the transfer cannot take place until the assignment has been perfected, the trustee asserts that the transfer took place

*Supply Co.*, 870 F.2d 1022 (5th Cir.1989); *In re Joe Flynn Rare Coins, Inc.*, 81 B.R. 1009 (Bankr. D.Kan.1988); *In re Walsh*, 5 B.R. 239 (Bankr.D. D.C.1980). A market value assumes a willing buyer and a willing seller. A sale by a judgment lien holder is a forced sale, not an arms length transaction. The Court does not believe that the defendant/judgment lien holder would have realized anything like one-half the market value from the sale of an undeveloped piece of property had it chosen to foreclose on its judgment lien rather than exchange that lien for cash payments and the assignment of the annuity contract. Notwithstanding the fact that the appraisers have used what is arguably the wrong standard, the Court feels compelled to accept the testimony offered and value the property based upon the most appropriate appraisal in time.

The Court also has difficulty concluding that the value of the property is $176,000.00. This apparently assumes a number of improvements in the property which would have to be made to realize a higher value. The appraisals both seem to place a substantial premium on the fact that this would make a nice location for a doctor's office in a growing community. That simply would not be a factor in a sheriff's auction on behalf of a judgment lien holder.

While the Court realizes that appraisal may be a relatively inexact art, the wide disparity in the values presented to the Court defies logic.

on August 17, 1987 within the ninety-day preference. The defendants, inter alia, claim that the transfers are not subject to the U.C.C. because the annuity contracts are policies of insurance and as such are exempt from coverage under the U.C.C. Asserting that the U.C.C. does not apply, defendants contend that state common law applies, and thus the transfers occurred and were perfected outside of the ninety-day preference period.

K.S.A. 84–9–104(g) excludes from the perfection requirements of the U.C.C. any transfer of an interest in any policy of insurance. *See* Kansas Bar Association, *Kansas Personal Property Secured Transaction Handbook*, § 2.25. Defendants state excathedra that "it is clear that the annuity contracts were insurance policies." Defendants' Supplemental Trial Brief at 2. Indeed, the Court can only find one case clearly in point. Under similar facts, however, the court in *In re Stutterheim*, 109 B.R. 1006 (Bankr.D.Kan.1988) (Pusateri, J.), held that an annuity contract is *not* a policy of insurance. *Id.; see also Rishel v. Pacific Mutual Life Insurance Co.*, 78 F.2d 881 (10th Cir.1935) ("It is very doubtful whether annuity contracts are insurance policies within the meaning of [the Colorado statute].... In many cases [they are] the exact converse, and in common parlance the word insurance does not embrace annuities.")

The defendants' reliance upon *Equitable Life Assurance Society v. Hobbs*, 154 Kan. 1, 114 P.2d 871 (1941), for support of their proposition that an annuity contract fits within the exception for life insurance, is unfounded. *Equitable Life* concerned only whether the term "premium" in a statute requiring companies to pay taxes on premiums, included consideration received from annuity contracts. The Supreme Court was only considering whether annuities are policies of insurance within the terms of the taxing statute. The court expressly refused to hold that annuity contracts were contracts of insurance. *Id.* at 154 Kan. 13, 114 P.2d 871.

K.S.A. 40–414(a) provides:

> If a life insurance company or fraternal benefit society issues any policy of insurance or beneficiary certificates upon the life of an individual and payable at the death of the insured, or in any given number of years, to any person or persons having an insurable interest in the life of the insured, the policy and its reserves, or their present value, shall inure to the sole and separate use and benefit of the beneficiaries named in the policy....

This Court has found no cases discussing the definition of "policy of insurance," and the parties have cited to none. The trustee has cited to *State ex rel. Londerholm v. Anderson*, 195 Kan. 649, 662, 408 P.2d 864 (1965), which discusses the term "insurance." In that case the term "insurance" is defined as "any contract whereby one party promises to pay for consideration to indemnify the other against certain risks." *Id.* at 662. While the definition is very broad, it does not necessarily indicate that every contract which contains some risk is a contract of insurance. *Id.* at 662. *See also In re Howerton*, 21 B.R. 621, 623 (Bankr.N.D.Tex.1982).

"An annuity contract differs materially from the ordinary life insurance contract in that it is payable during the life of the annuitants rather than upon any future contingency...." *Couch on Insurance 2d* § 81:2 (1983). *See also* 43 Am. Jur.2d *Insurance* § 5 (1982). The annuity contract does not appear to fall within the plain meaning of K.S.A. 40–414. *In re Stutterheim, supra; In re Barash*, 69 B.R. 231 (Bankr.D.Kan.1984) (Pusateri, J.). The debtors each entered into deferred annuity contracts naming their respective selves as beneficiaries. The disclosure statements of the annuity contracts provide that the owner of the annuity contract is entitled to three payment options: (a) lump sum payment; (b) payment over a period no longer than the life of the owner and the spouse of the owner; or (c) payments over a period not extending beyond the life expectancy of the owner. The contract is not "payable at the death of the insured" and it is not payable "to any person or persons having an insurable interest in the

life of the insured," but rather is payable to the annuitant himself and herself respectively. An annuity contract is not necessarily a life insurance policy simply because a life insurance company issued it. *In re Howerton, supra* at 623. Exceptions to the U.C.C. should be construed narrowly. Thus, the Court is compelled to conclude that the annuity policies are not insurance policies, assignment of which are excepted from the U.C.C. The U.C.C. applies.

■ Assignments of rights to payments under contracts are subject to the filing provisions of the U.C.C. unless the assignment falls within the provisions of K.S.A. 84–9–104(f). *In re Southworth*, 22 B.R. 376 (Bankr.D.Kan.1982). Under this subsection assignment of right to payments are governed by the U.C.C. unless the assignment is:

> [A] sale of accounts or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts or chattel paper which is for the purpose of collection only, or a transfer of a right to payment under a contract to an assignee who is also to do the performance under the contract or a transfer of a single account to an assignee in whole or partial satisfaction of a preexisting indebtedness.

The above referenced assignments cannot fit within this exception. Therefore, the assignments are governed by Article 9.

In order to perfect their security interest in the annuity contracts as required by Article 9, the defendants must have filed a financing statement. K.S.A. 84–9–401. This was done on August 17, 1987. This is the date the defendants were deemed perfected in those contracts.

■ For preference purposes state law determines when a transfer is perfected, but federal law determines when a transfer is made. *In re Hogg*, 76 B.R. 735 (Bankr. D.S.D.1987). *See also In re Mailbag International*, 28 B.R. 905 (Bankr.D.Conn.1983). The time at which a transfer is made is solely dependent upon when the transfer is perfected. 11 U.S.C. § 547(e)(2). *See also In re Hensley*, 70 B.R. 237 (Bankr.D.Kan.

1987). The transfers occurred, therefore, on August 17, 1987 when the defendants perfected their interests in the annuity contracts. Thus, the debtors' transferred their interest in the annuity contracts within the ninety days preceding bankruptcy and within the preference period.

■ Even assuming that the U.C.C. was not intended to cover an assignment of annuity policy, the defendants' arguments in this instance must still fail, as the earliest the assignment could have been perfected was when they were acknowledged by the annuity company. Here, Jackson National Life was informed of the collateral assignments on August 18, 1987. Jackson acknowledged the assignments by letter on September 10, 1987. Assuming, arguendo, that the annuity contract was, in fact, an insurance contract, the earliest that its assignment can be perfected is when the annuity company acknowledges the assignment in writing. In this case that did not take place until September 10, 1987. Thus, the defendants' interest in the contracts was perfected only at that time which fell well within the ninety-day period.

The Court, therefore, concludes that under any theory the defendant's interest in the annuity policies was perfected and, therefore, the transfers occurred within ninety days of the filing of the petition for relief herein.

### II. A Preference Occurred.

Having determined that the transfers of the policies took place within the preference period, the Court must determine if the transfers were actual preferences. The issue of law is: whether the transfers made after August 7, 1987 constitute preferential transfers within the meaning of 11 U.S.C. § 547(b) and if so, whether the transfers come within the contemporaneous exchange for new value exception under § 547(c)(1).

■ The avoidance of preferential transfers assures that equally-situated creditors are equally treated by the debtor and that no one creditor will be favored during the preferential period. *In re Gulino*, 779

F.2d 546, 548–49 (9th Cir.1985). However, if the transfer was a substantially contemporaneous exchange and if new value was given the debtors, the transfer will fall within an exception to the preference statute.

The trustee has the burden to prove each and every one of the elements of a preference under § 547(b). *Waldschmidt v. Ranier (In re Fulgham Construction Corp.)*, 706 F.2d 171, 172 (6th Cir.1983), *cert. denied*, 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983). The elements of a preference under § 547 are: (1) a transfer of property to the debtor; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor before such transfer was made; (4) made while the debtor was insolvent; (5) made—(a) on or within ninety days before the date of filing the petition; (6) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title. *In re Air Conditioning, Inc. of Stuart*, 845 F.2d 293 (11th Cir.1988); *see also Moran Bros, Inc. v. Yinger*, 323 F.2d 699 (10th Cir.1963). The parties have stipulated: (1) the debtors were insolvent on the date the transfers were made; (2) the transfers were made for the benefit of the defendants. The Court has concluded that the transfers were made within the ninety days preceding bankruptcy. The Court further finds that the trustee has met his burden with each of these other elements and, unless the defendants can fit within the contemporaneous exchange for new value exception under § 547(c)(1), the trustee may avoid the transfers.

### III. The New Value Exclusion.

In order to best determine whether the exchange comes within the new value ex-ception the Court must determine the value of the property. Two appraisals were offered at trial. All of the appraisal testimony used a market valuation method for determining the value of the Derby Lot. While the Court believes that the liquidation method of valuing the collateral is a more appropriate method, *see Matter of Clark Pipe & Supply Co.*, 870 F.2d 1022 (5th Cir.1989), it accepts the value offered by the defendants. *See* fn. 2 above. The property upon which the lien was released is valued at $143,000.00 and the debtors' one-half interest at $71,500.00.[3]

The exception relied on by defendants is contained in § 547(c)(1) and excludes from the preference definitions those transfers that are intended to be "a contemporaneous exchange for new value given to the debtor," and which, in fact, constitutes a "substantially contemporaneous exchange." 11 U.S.C. § 547(c). The burden is on the defendants to prove each element of the exception by a preponderance of the evidence. *In re Richter & Phillips Jewelers & Distributors, Inc.*, 31 B.R. 512, 515 (Bankr.S.D.Ohio 1983); 11 U.S.C. § 547(g). The defendants must prove that new value was given and that the transactions were intended to be substantially contemporaneous. New value is defined in 11 U.S.C. § 547:

"[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

The facts in this case are similar to the facts before the Circuit in *In re George Rodman, Inc.*, 792 F.2d 125 (10th Cir.1986). In *George Rodman*, a supplier had ad-

---

**3.** The defendants make much to do concerning the mutuality of consideration for the release of lien on the debtors' homestead. In Kansas a judicial lien does not attach to homestead property. *See Maus v. Maus*, 837 F.2d 935, 938 (10th Cir.1988); *Jones v. St. Francis Hospital*, 225 Kan. 649, 594 P.2d 162 (1979). Therefore, no value was exchanged for release of the alleged judgment lien on debtors' homestead. This part of the forbearance agreement will not go into the valuation equation.

vanced materials to debtor for the use in drilling various oil and gas wells. After payment was not received the supplier filed materialmen's liens on certain wells, one of which was the subject of the dispute. The debtor paid the supplier the amount owed and the liens were released. Shortly thereafter the well was plugged as a dry hole. Then, an involuntary bankruptcy petition was initiated against the debtor. The Circuit Court held that debtor's payment to creditor and the simultaneous release of a lien constituted contemporaneous exchange for new value. The court held that the Code's broad definition of transfer encompasses the creation and release of liens. *Id.* at 128, n. 6. *See also In re Conner,* 733 F.2d 1560, 1562 (11th Cir.1984). In this case there was a release by a transferee (defendants) of property (the lien) previously transferred to such transferee. *In re George Rodman, Inc., supra* at 127–28; 11 U.S.C. § 547(a)(2). Under *George Rodman,* new value was given upon release of the lien by the defendants in the amount of the value of the debtors' interest in the Derby Lot.

The debtors transferred to defendant, within the ninety days prior to the filing date, $37,947.90 worth of annuity insurance contracts and $49,143.15 in cash. The total dollar value of the transfers is $87,091.05. $87,091.05 exceeds the value of the debtors' one-half interest in the Derby Lot by $15,591.05. Accordingly, the Court holds that the defendants received a preference of $15,591.05.

### IV. The Transfers Are Not Fraudulent.

Finally, the trustee asserts that the transfers to the defendants were fraudulent and as such are voidable by the trustee. The trustee contends that in exchange for release of judgment liens on debtors' interest in the Derby Lot worth $30,000.00, debtors made payment of $89,143.15. The trustee asserts that this exchange is not "reasonably equivalent" value and, therefore, the transfers are voidable under § 548(a)(2). The defendants contend, however, that the transfers are not voidable because the debtors received reasonably equivalent value in the exchange. The issue of law is whether the release of the liens on debtors' interest in the Derby Lot was reasonably equivalent in value to the transfers debtors made to the defendants. Interwoven in this issue is the Court's determination of the value of the debtors' interest in the Derby Lot.

In determining fair consideration the Court must look at what the debtors received regardless of what the creditor may have gained or lost. *In re Jamison,* 21 B.R. 380, 382 (Bankr.D.Conn.1982). At the time of the transfer defendant held a valid judgment lien on debtors' property. The transfer (i.e., the release of the lien given in exchange for the payment to the defendant) satisfied an antecedent debt of the debtors. This transfer constituted value under § 548(d)(2). *In re Twelve Oaks, Ltd.,* 59 B.R. 736 (Bankr.M.D.Fla.1986). In exchange for forgiveness of debt to the extent of $411,447.88 the debtors gave up $127,091.05 worth of assets. The value was roughly equal and so the Court finds reasonably equivalent value was received by the debtors. *See Matter of Wey,* 854 F.2d 196 (7th Cir.1988); 11 U.S.C. § 548(a)(2). The trustee is precluded from prevailing on his § 548 claim.

The foregoing constitutes findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

### JUDGMENT ON DECISION

The instant proceeding comes before the Court for ruling on the trustee's complaint for the recovery of preferential and fraudulent transfers. The Honorable John K. Pearson, United States Bankruptcy Judge, presiding. The matter having been submitted through stipulations and briefs to the Court, and a decision having been rendered,

IT IS ORDERED BY THE COURT that the transfer of debtors' interest in the annuity contracts occurred within ninety days of the filing of the petition for relief herein.

IT IS FURTHER ORDERED that the transfer to the defendants of the annuities and cash payments exceed the value of the debtors' interest in the Derby Lot by $15,591.05 and to that extent the transfer is a preference.

IT IS FURTHER ORDERED that the defendants turn over the amount of $15,591.05 to the trustee for distribution through the estate.

IT IS FURTHER ORDERED that the transfers were not fraudulent.